889 F.2d 1087
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
GLOBE BUSINESS FURNITURE, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 88-6044, 88-6103.
 United States Court of Appeals, Sixth Circuit.
 Nov. 21, 1989.
 
 Before KRUPANSKY and RYAN, Circuit Judges, and HENRY R. WILHOIT, Jr., District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 Petitioner seeks review, and respondent enforcement, of a decision and order of the National Labor Relations Board ("the Board"). The Board adopted an administrative law judge's finding that Globe Business Furniture Company ("Company" or "Globe") violated Secs. 8(a)(1), (3), and (5) of the National Labor Relations Act, 29 U.S.C. Secs. 158(1), (3), and (5). Pursuant to those findings, the Board ordered the Company to cease and desist from the unfair labor practices it found and to pay employees for a ten-day lockout that occurred in December of 1986.
 
 
 2
 The only issue on appeal is whether substantial evidence supports the Board's various findings. We conclude that it does, and we order enforcement of the Board's order.
 
 I.
 A.
 
 3
 Since about 1963 the Southern Council of Industrial Workers ("Union") has been the collective bargaining representative of certain of Globe's employees. The parties currently operate under a collective bargaining agreement; the issues in this case concern events preceding and just following the expiration of the prior agreement in late 1986.
 
 
 4
 In a letter dated September 2, 1986 to Globe vice president Frank Patterson, Ray White, executive secretary of the Union, informed Patterson that the Union sought to modify the then existing labor agreement covering Globe employees at "Local Union 2338," which was set to expire December 1, 1986, and requested that the Company begin negotiations with Timothy Byrd, White's assistant. The letter, in part, stated:
 
 
 5
 It is further requested that you furnish Mr. Byrd with a list showing names, addresses, phone numbers, classifications, and wage rates of all employees, along with fringe benefits currently received and cost of same. In addition, we will need each employee's age, sex, and marital status and number of single and family plans, and a complete breakdown on the present insurance cost plus the past two years loss experience.
 
 
 6
 Several days later, Globe's industrial relations manager, Danny Bates, responded by letter that it would take him "a while" to accumulate all of the requested information and that he might not be able to get it all.
 
 
 7
 The parties began negotiations on November 7. Timothy Byrd, Willie Jenkins, Clifford Wilkinson, and Dorothy White represented the Union. Frank Patterson and Danny Bates represented Globe.
 
 
 8
 Byrd testified that on November 7 the Company proposed changing provisions in the collective bargaining agreement dealing with insurance and the hiring of temporary employees. Byrd testified that he told the Company's representatives that the Union was unable to propose or evaluate any insurance plan because the Company had not provided the information requested in the letter of September 2, and that the information was needed so that the Union could obtain a "competitive bid" on the insurance from the Union trust fund. Apparently Bates told Byrd that the Company would provide Jenkins with the requested information in a few days. Bates testified that not until ten days later, at the next meeting, did he receive anything.
 
 
 9
 Patterson disagreed. He testified that Bates submitted the requested information in a handwritten notice upon request and that the Union indicated that its reason for not submitting an insurance proposal was not that it had insufficient information, but that it was still waiting to hear from its trust fund.
 
 
 10
 Bates did not testify concerning the November 7 meeting, but he did testify that the Union did not request insurance information specifically concerning Union employees until December 13. The ALJ found otherwise:
 
 
 11
 I do not credit Bates' testimony that the Union first asked for unit insurance costs on 13 December. In addition to Wilkinson's explicit testimony, it is obvious from White's original demand letter that he was asking for information pertaining only to unit employees. Patterson admitted that he knew the parties were negotiating only about unit employees.
 
 
 12
 Bates also testified that the Union could have discovered the information it requested through an examination of Company time cards, time clocks, seniority and check off lists, and like sources, and by questioning Union stewards. The ALJ disagreed. He found that even if the Union had resorted to self-help it still would have failed to obtain some of the relevant information requested.
 
 
 13
 The parties met again ten days later. According to the Union, the Company had still not supplied the Union with the specific information requested in White's letter of September 2. The Union proposed a general increase in medical benefits and the creation of a dental plan. Bates then handed Byrd a handwritten note which stated that the Company had paid insurance claims of more than $400,000 in 1985 and $438,000 in 1986. Bates also indicated that there were about 540 insured employees. Byrd testified that he repeated his request for information and that Patterson and Bates said they would provide it "the next day."
 
 
 14
 Byrd testified that on November 18 he told Bates that the previous representation of 540 unit employees in the insurance plan was wrong, and that the Company's totals must have included nonunit employees. After Bates called his office, he reported that Globe had 377 unit employees.
 
 
 15
 On November 19, Globe vice president of finance James Mills attended the bargaining session in order to give the Union some financial information. According to the Union, Mills stated that the Company's medical insurance cost amounted to about $1.40 per employee per hour. The Union calculated that at that rate Globe would spend about $1,200,000 for medical insurance for bargaining unit employees and pointed out that Mills' projection was almost triple what Globe had spent the previous year. The ALJ found:
 
 
 16
 Chief steward Wilkinson testified that he told the Company that they as well as the Union knew that their $1.2 million figure was "ridiculous." Patterson agreed that the figure was high and said that he would try to get to Corroon & Black in a day or two, and get the matter "straightened out." Byrd affirmed that Patterson promised the information the next day.
 
 
 17
 Company Vice President Patterson acknowledged that Mills spoke at the 19 November meeting and gave "projected financial information." However, Patterson denied that there was any discussion of insurance or any request for insurance information. The Union asked to see the Company's audited financial statements. Mills did not testify.
 
 
 18
 The Company presented its own economic proposals on November 20. These proposals initially included increasing the medical insurance deductible and requiring employees to pay for medical insurance coverage for their dependents. At the meeting the parties modified the insurance proposal to require only "new" employees--those hired after December 1--to pay one-half the cost of their dependents' medical insurance coverage.
 
 
 19
 Byrd testified that he told the Company representatives that the Union could not determine the actual cost for dependent coverage for new employees without an explanation of the vast difference between the $438,000 figure given as the actual cost for the previous year's insurance and the $1,200,000 cost projection the Company had quoted for the coming year. In response, according to Byrd, Patterson shrugged his shoulders and Bates repeatedly denied that the Company could get the requested information. The Union told the Company that it knew it could get the information from the plan administrator.
 
 
 20
 After observing and hearing the Union's witnesses the ALJ concluded that "through November, the Company did not provide any of the information requested by the Union, either in White's 2 September letter, or during negotiations. However, the parties did agree on various noneconomic matters."
 
 
 21
 On December 1, the Union's members voted to reject the Company's proposal but to continue working while negotiations continued. After the meeting, Byrd called Patterson to request a fifteen-day extension of the current agreement set to expire. He also told Patterson that if the Company refused to extend the agreement, he would have to go back to the membership for a strike vote. Patterson and Byrd agreed to an extension of the agreement through December 8.
 
 
 22
 According to the Union officials, the Union repeated its objections to the insurance cost information provided by the Company during negotiations in early December. Patterson agreed to call the insurance plan administrator, Corroon & Black, to get a "costing" of dependent coverage based on actual loss experience. The Union also expressed concern about the Company's proposal to eliminate the contractual ceiling on the number of "new" or "temporary" employees--new employees hired at lesser wage rates and with fewer benefits. The Union asked how many "temporary" employees Globe planned to hire and requested Globe's turnover data for the last three years. The Union indicated that it wanted the data indicating actual turnover experience in order to test the accuracy of the Company's projection for new hiring. Globe representatives told the Union that Globe planned to hire 100 temporary employees. Union officials testified that throughout these negotiations the Company continually broke promises to deliver requested information.
 
 
 23
 Union representatives testified that at a meeting with Company officials on December 4, the Union repeated its request for the information originally requested and that Globe representatives replied that they did not have the information. Shortly thereafter, the Union gave Patterson a letter requesting documentation substantiating the Company's claims concerning the number of unit employees and the employee turnover rate; the projected number of employees in 1987; the projected number of temporary employees in the next three years and the means of arriving at this figure, and related information. Byrd told the Company that the Union needed the information to assess the effects of the Company's proposal on temporary employees and to test the projected insurance costs for new hires. Patterson said that he would give the requested information to Union president Jenkins and other negotiating committee members on the following day.
 
 
 24
 Early on the morning of Saturday, December 6, Patterson called Byrd at home and requested they meet. Byrd said he had other Union business, including an evening meeting with the negotiating committee. Patterson then informed Byrd that he would deliver the Company's "final proposal" that morning to the committee members. Byrd asked whether the Company had given Jenkins the information the Union had requested. Patterson admitted he had not. According to Byrd, during this conversation he told Patterson that under the circumstances the committee was not obligated to give the proposal to the membership. He also told Patterson that the Union needed the requested information and that he felt the Company was not bargaining in good faith. Later that morning, Globe representatives left the proposal and a cover letter in Jenkins' mailbox and distributed copies to other committee members, including Byrd.
 
 
 25
 The Union's membership met on Sunday, December 7, to vote on Globe's December 6 proposal. The members rejected the proposal but voted to continue working and to send the negotiating committee back to the bargaining table.
 
 
 26
 Apparently unaware that the Union had rejected the proposal, Patterson and Bates held various meetings with employees on December 8. At a 10:00 a.m. meeting with press and maintenance employees, Patterson said that the Union had "misled" the employees and that he wanted to explain the Company's proposal. There were at least two other meetings that day, one at noon and one at about 2:00 p.m. It is undisputed that during these meetings Patterson said the Union had not understood, or had inaccurately explained to employees, the Company's proposal. Patterson read the Company's proposal from an overhead projector. Some testimony also indicated, however, that in response to questions from employees, Patterson said that the Company had responded to Byrd's information requests and that the Company's estimate for the contribution by new employees to dependent insurance coverage remained $75 per employee per month.
 
 
 27
 The ALJ credited the following account of the December 8 employee meetings:
 
 
 28
 I credit the testimony of the General Counsel's witnesses and conclude that the Company held employee meetings on 8 December during which Vice President Patterson read the Company's last contract proposal and said that the Union had misled the members about it, and stated that there might be a lockout....
 
 
 29
 I further conclude that the Company had not given the Union the actual cost of one-half of dependent coverage at that time, and, indeed, did not even have it. I credit Jenkins' uncontradicted testimony that Patterson told employees on 8 December that the cost was still $75. Since this figure was based on Corroon & Black's "projected" cost figures in its 30 October letter, the clause in the Company's 6 December proposal--that the employee's share was based on actual cost--was either erroneous or incomplete.
 
 
 30
 (Footnotes omitted.)
 
 
 31
 Following a telephone conversation with Byrd on December 8, Patterson concluded that the parties were at an impasse and so the Company decided to lock the employees out of the plant at midnight. Patterson testified that Byrd offered nothing further in the telephone conversation; however, Byrd said that he told Patterson the Company had options other than a lockout, including the implementation of its final offer, and repeated his assurance that the employees wanted to keep working.
 
 
 32
 The Company shut the plant down and locked the employees out at midnight on December 8. Despite a subsequent exchange of letters between Byrd and Patterson and the intervention of a federal mediator on December 10 or 11, no agreement was reached, the lockout continued, and the insurance cost data and related information repeatedly requested by the Union was not produced.
 
 
 33
 On December 17, the parties met separately, with the federal mediator acting as go-between. This mediation resulted in an agreement, and the employees returned to work the next day.[1]
 
 B.
 
 34
 Based on the ALJ's findings of fact, the Board found that the Company violated Secs. 8(a)(5) and (1) of the Act by refusing to supply the Union in a timely manner with information relevant to bargaining and by bypassing the Union as the statutory bargaining representative of its employees. The Board also found that the Company violated Secs. 8(a)(3) and (1) of the Act by locking out its bargaining unit employees after having refused to furnish the Union with information relevant to bargaining. The Board noted that:
 
 
 35
 In adopting the judge's conclusion that the Respondent violated Sec. 8(a)(3) and (1) of the Act by locking out its employees, we note that the lockout was implemented following the Respondent's repeated, unlawful refusals to provide the Union with information it had requested for bargaining. Within the context of these preexisting unfair labor practices, the Respondent's subsequent lockout of its employees may not be found legitimate.
 
 
 36
 Similarly, the Respondent's failure to provide the Union with crucial information central to bargaining renders unlawful its December 8, 1986 meetings with employees. While it is true, as the respondent contends, that an employer may properly meet outside the presence of the union in order to explain its contract proposals directly to its employees, this is not so when the employer, as the Respondent has done here, has denied the Union the very information it needed to evaluate those same proposals during negotiations. In such circumstances, the Respondent's dialogue with employees is not a privileged communication under 8(c) of the Act, but rather is an effort at circumventing its obligation to deal with the exclusive representative of those employees. Accordingly, we agree with the finding that the Respondent thereby violated Sec. 8(a)(5) and (1) of the Act. Cf. United Technologies, 274 NLRB 609, 610 (1985), enf'd. 789 F.2d 121 (2d Cir.1986).
 
 
 37
 The Board ordered the Company to cease and desist from the unfair labor practices found and to cease and desist from, in any like or related manner, interfering with, restraining, or coercing employees in the exercise of their rights under Sec. 7 of the Act. Affirmatively, the order required the Company to supply the Union, upon request, with the bargaining information; to make whole each employee whom it locked out; and to post an appropriate notice.
 
 
 38
 Globe appeals the order; the NLRB petitions for its enforcement.
 
 II.
 A.
 
 39
 Employers are obligated to provide information necessary for bargaining representatives properly to perform their duties. N.L.R.B. v. Acme Industrial Co., 385 U.S. 432, 435-436 (1967). Accord Detroit Edison Co. v. N.L.R.B., 440 U.S. 301, 303 (1979); N.L.R.B. v. Truitt Mfg. Co., 351 U.S. 149, 152 (1956); N.L.R.B. v. U.S. Postal Service, 841 F.2d 141, 144 (6th Cir.1988). Unjustifiably failing to provide such information upon request constitutes a violation of an employer's duty to bargain in good faith, in violation of Secs. 8(a)(5) and (1) of the Act (29 U.S.C. Secs. 158(a)(5) and (1)), for without such relevant information a union cannot effectively function as the statutory bargaining representative of the unit employees. Local 13, Detroit Newspaper Union v. N.L.R.B., 598 F.2d 267, 271 (D.C.Cir.1979), and cases cited therein; General Electric Co. v. N.L.R.B., 466 F.2d 1177, 1182-83 (6th Cir.1972); Curcis-Wright Corp. v. N.L.R.B., 347 F.2d 61, 68 (3d Cir.1965).
 
 
 40
 In order to find that a union is entitled to production of the information it has requested, the Board need only find a "probability that the desired information [is] relevant, and that it would be of use to the union in carrying out its statutory duties and responsibilities." N.L.R.B. v. Acme Industrial Co., 385 U.S. 432, 437 (1967); N.L.R.B. v. Rockwell-Standard Corp., 410 F.2d 953, 957 (6th Cir.1969). Courts have characterized this broad disclosure rule as a "broad discovery type standard," granting a union access to a wide range of potentially relevant information necessary to the union's role as bargaining representative. N.L.R.B. v. Acme Industrial Co., 385 U.S. at 437 and n. 6; Asarco, Inc. v. N.L.R.B., 805 F.2d 194, 197 (6th Cir.1986); N.L.R.B. v. Pfizer, Inc., 763 F.2d 887, 889-890 (7th Cir.1985).
 
 
 41
 Information relating to wages or benefits of unit employees is presumptively relevant to a union's statutory functions. Thus, a union is entitled to disclosure of that type of information without regard to the information's immediate relationship to the negotiation of a particular bargaining agreement or its precise relevancy to a particular bargaining proposal. Whitin Machine Works, 108 NLRB 1537, 1539, enf'd, 217 F.2d 593 (4th Cir.1954), cert. denied, 349 U.S. 905 (1955); Ohio Power Co., 216 NLRB 987, 991 (1975), enf'd, 531 F.2d 1381 (6th Cir.1976); Bohemia, Inc., 272 NLRB 1128, 1129 (1984). Moreover, "the Board's determination as to whether the requested information is relevant in a particular case is given great weight by the courts...." San Diego Newspaper Guild v. N.L.R.B., 548 F.2d 863, 867 (9th Cir.1977). Accord Asarco, Inc. v. N.L.R.B., 805 F.2d at 196 and cases cited therein; N.L.R.B. v. U.S. Postal Service, 841 F.2d 141, 144 (6th Cir.1988).
 
 
 42
 Finally, it is the ALJ's function to resolve questions of fact and credibility and, in reviewing those findings, "this Court ordinarily will not disturb credibility evaluations by [the trier] who observed the witnesses' demeanor." Turnbull Cone Baking Co. v. N.L.R.B., 778 F.2d 292, 295 (6th Cir.1985), cert. denied, 476 U.S. 1159 (1986) (quoting N.L.R.B. v. Baja's Place, 733 F.2d 416, 421 (6th Cir.1984)). Accordingly, the Board's credibility determinations are accepted on review unless shown to be unreasonable. Colfor, Inc. v. N.L.R.B., 678 F.2d 655, 656 (6th Cir.1982); N.L.R.B. v. Interurban Gas Corp., 317 F.2d 724, 725 (6th Cir.1963).
 
 B.
 
 43
 The ALJ's findings of fact, which for the most part the Board adopted, provide substantial evidence to support the Board's decision. The ALJ, and through adoption the Board, found the testimony of the various Union personnel to be more credible than that of the only Globe employee testifying concerning the relevant information. The ALJ specifically noted that:
 
 
 44
 Union spokesman Byrd was a credible witness with good recall of the events. In addition, he was corroborated on various points by other Union witnesses. The only Company witness who testified about these events, Vice President Patterson, was inconsistent at times and was uncorroborated. Thus, Patterson's assertion that there was no discussion of insurance at the 17 November meeting is inconsistent with his claim that he then gave a copy of the Corroon & Black letter concerning that subject to Union spokesman Byrd. In the absence of any testimony from financial officer Mills, I credit the Union witnesses that Mills discussed Company finances including projected insurance costs on 19 November. Patterson agreed that Mills gave "projected financial information," but denied that he discussed insurance. I do not credit this denial, or Patterson's other denials that the Union requested insurance information. I conclude that the Union on various occasions repeated the request for information in White's letter and told the Company the reason it needed this information--in order to get a competitive bid from the Union Trust Fund. It is unnecessary to determine whether the Union's proposal was made on 7 or 17 November, although it is probable that Byrd was correct in affirming that it was given on the earlier date.
 
 
 45
 Most of Globe's appeal involves nothing but an assertion that the ALJ and the Board erred in believing the Union over the Company. But appellant offers no sound basis for overturning the credibility determinations made below.
 
 
 46
 Because the credited testimony provides substantial evidence to support the Board's determinations, the only other issue of any significance raised in this appeal is whether the Company had an absolute right to shut down its plant. Citing American Ship. Bldg. Co. v. N.L.R.B., 380 U.S. 300, 308 (1965), and N.L.R.B. v. Brown, 380 U.S. 278 (1965), Globe argues that the lockout was an entirely proper way of resolving a bargaining impasse by coercing employees into accepting its last proposal.
 
 
 47
 While the Company is correct to note that a lockout may be a proper means of attempting to resolve a bargaining impasse, as the Board recognizes, in the context of the unfair negotiating present here, this lockout was illegal. In adopting the ALJ's conclusion that the Company violated Sec. 8(a)(3) and (1) of the Act by locking out its employees, the Board relied on the "context" created by the "preexisting unfair labor practices" and, accordingly, did not find that the parties had reached a bargaining regarding impasse. Thus, the Company's assertion that the lockout was a proper means of resolving what had become a bargaining impasse is incorrect. The Board correctly noted that a proper bargaining impasse could not have been reached in this case because substantial evidence indicated that the Company failed to negotiate in good faith prior to the alleged impasse by withholding requested information relevant to bargaining.
 
 III.
 
 48
 For the aforementioned reasons, we AFFIRM the decision and direct ENFORCEMENT of the order.
 
 
 
 *
 The Honorable Henry R. Wilhoit, Jr., United States District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 The final agreement provided for insurance coverage according to a benefit schedule for all employees who had completed 120 working days. All employees were to pay $3 weekly for insurance coverage. The agreement increased the number of temporary employees the Company could hire from 15 to 25, and permitted their compensation at wage rates lower than those of regular employees