902 F.2d 34
 134 L.R.R.M. (BNA) 2568
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
UNION UNDERWEAR COMPANY, INC., Respondent.
 No. 89-5743.
 United States Court of Appeals, Sixth Circuit.
 May 1, 1990.
 
 Before KRUPANSKY and MILBURN, Circuit Judges; and THOMAS, Senior District Judge*.
 PER CURIAM.
 
 
 1
 Petitioner NLRB seeks enforcement of its order directing respondent Union Underwear Company ("Company") to remedy unfair labor practices in violation of sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(1) & (3). For the reasons that follow, we enforce the Board's order.
 
 I.
 A.
 
 2
 The International Brotherhood of Teamsters, Local 651 ("Union"), brought unfair labor practice charges alleging interference with its attempt to unionize the Company's undergarment factory in Frankfort, Kentucky. After a hearing, an ALJ found that the Company (1) did not maintain a discriminatory practice in regard to posting of union literature, (2) did not discriminate against in-house organizing committee member Harper when it disciplined her for failure to make repairs, and (3) did not discriminate against committee member Robinson when it disciplined her for tardiness. The ALJ found that the Company did commit unfair labor practices by (1) threatening plant closure and loss of jobs in the event of unionization and by giving the impression of surveillance of employee's activities, (2) discriminatorily discharging committee member Elizabeth Gillman, and (3) placing an unfavorable incident report in the personnel file of committee member Guadalupe Pickett. The ALJ ordered corrective action accordingly. The Company filed exceptions to the ALJ's decision, and on March 30, 1989, the Board affirmed the ALJ's decision and order. This petition for enforcement followed.
 
 B.
 
 3
 The facts in this case are supplied by the testimony and exhibits admitted during the unfair labor practice hearing. The record shows that in early February 1988 the Union informed the Company that Debbie Hall, Elizabeth Gillman, Guadalupe Pickett, and others had agreed to be part of its in-house organizing committee. On February 4, 1988, committee member Debbie Hall approached her floor lady[1], Mary Jo Cochran, and initiated a conversation as to why Cochran, a good friend of Hall's, had stopped speaking to her. Cochran responded that she had learned that Hall was on the in-house organizing committee. Cochran also told Hall that "[the plant manager] said he wouldn't negotiate and he would say no to everything and that he would close the doors." Hall heard Cochran tell another employee that "if the Union comes in, we're going to be out the door." No witness refuted Hall's testimony.
 
 
 4
 Committee member Elizabeth Gillman testified to similar remarks from her floor lady, Sharon Wells. Some of the remarks were connected with an incident in which Wells removed pro-union posters and other items from Gillman's work display area. Wells admitted removing the signs and personal items but denied ever having a conversation with Gillman about the Union.
 
 
 5
 Committee members Gillman and Pickett testified that the Company ordered removal of all pro-union signs but allowed approximately a month to elapse before it took down anti-union signs. Other than their own work station, they could give no specifics. Company personnel testified that both pro-union and anti-union signs were ordered removed simultaneously and for legitimate reasons. The ALJ rejected Gillman's and Pickett's testimony as indefinite in favor of the Company's evidence.
 
 
 6
 Gillman was very active in Union activities and even gave pro-union literature to the Company's vice-chairman of the board immediately after he made an anti-union speech to a gathering of employees. The vice-chairman investigated and found that it was Gillman who had given him the literature. A week later Gillman was terminated, allegedly for leaving work early without giving the Company notice. It was uncontested that Gillman rode with a co-employee and was forced to leave when the co-employee left early because of an emergency. Gillman claimed that she left a note on her floor lady's desk to give the Company notice of her absence. Gillman said that Watts (the plant manager) told her that he was firing her because she was on the organizing committee and he wanted to make an example of her.
 
 
 7
 Watts denied making any anti-union statements to Gillman and denied that he fired her because of her union activities. Floor lady Wells and Watts both testified that the Company had a policy of considering any employee who leaves early without giving notice as having "voluntarily quit." Both Wells and Watts admitted that any notice to the Company, even a note, would have been sufficient notice and that Gillman's excuse would not have been questioned. Watts claimed that he had checked Gillman's story out but could not find a note. The ALJ found Watts unbelievable because Watts could not have known Gillman claimed to have left a note until he called her into his office to fire her. Watts admitted that Gillman's final check was drawn on Friday so that it could be ready for her discharge on Monday morning. Watts admitted Gillman was a good employee and that Company policy was to rehire good employees, even after discharge. Watts also said that Gillman immediately asked to be rehired but was refused.
 
 
 8
 Committee member Guadalupe Pickett was also the target of allegedly discriminatory discipline. On February 26, 1988, Pickett's floor lady, Sharon Wells, asked her to work the next day, a Saturday. Pickett asked if attendance was mandatory, and Wells responded that it was not. Pickett said that she would work only if her ride, Linda, was also working. Pickett and Wells approached Linda, and Wells told Linda that she must work on Saturday. Since Linda was working, Pickett agreed to work also.
 
 
 9
 Pickett left work planning to be present on Saturday, but on the ride home Pickett learned that Linda had been excused from working on Saturday. Pickett called and left a message informing Wells that she would not be present on Saturday.
 
 
 10
 When Pickett arrived at work the next Monday, her time card was missing and an absentee card was in its place. Pickett grew angry and argued with several people along the supervisory chain but was told that it was not the Company's responsibility to help her arrange transportation to work. In the end, Pickett was charged with an unexcused absence, docked fifteen minutes for arguing, and given a write-up for the incident.
 
 
 11
 The principal issue presented for review is whether substantial evidence supports the Board's findings of unfair labor practices.
 
 II.
 A.
 
 12
 Judicial review of Board findings is limited by statute so that the Board's factual determinations are conclusive if they are supported by "substantial evidence on the record considered as a whole." 29 U.S.C. Sec. 160(e); see John M. Horn Lumber Co. v. NLRB, 859 F.2d 1242, 1243 (6th Cir.1988). Substantial evidence is "that quantum of evidence that a reasonable mind might accept as adequate to support a conclusion." NLRB v. Beacon Light Christian Nursing Home, 825 F.2d 1076, 1078-79 (6th Cir.1987) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951)). "Application of this standard requires the Court to consider the body of evidence which opposes the Board's decision, but prohibits the Court from conducting a de novo review of the record." Union Carbide Corp. v. NLRB, 714 F.2d 657, 660 (6th Cir.1983). Where there is conflict in the testimony, it is normally the Board's function to resolve questions of fact and credibility. NLRB v. Baja's Place, 733 F.2d 416, 421 (6th Cir.1984) (per curiam).
 
 B.
 
 13
 The ALJ found that comments by floor lady Cochran to Debbie Hall and Judy Ballenger to the effect that the Company would close down and move if the Union were voted in constituted unfair labor practices because they threatened "plant closure, loss of jobs and futility of negotiations." He found that similar comments by floor lady Wells to Elizabeth Gillman were unfair labor practices because they threatened "plant closure, loss of jobs and [left] the impression that employees [were] under surveillance because of their union sympathies and activities."
 
 
 14
 The Company argues that the alleged comments by Cochran and Wells do not amount to substantial evidence because they were at most isolated conversations between friends which, when considered in context, could not reasonably tend to interfere with, restrain or coerce employees. See NLRB v. Okun Bros. Shoe Store, 825 F.2d 102, 105 (6th Cir.1987), cert. denied, 485 U.S. 935 (1988). The Company tries to show that Okun Bros. and Pease Co. v. NLRB, 666 F.2d 1044 (6th Cir.1981), cert. denied, 456 U.S. 974 (1982), support its position; however, Pease fails to undercut the ALJ's determination and Okun Bros., in fact, supports the ALJ's determination.
 
 
 15
 Pease is distinguishable from this case in that the only statement which was made that could have amounted to an unfair labor practice was ambiguous and an innocent interpretation was more consistent with the words than an anti-union statement. 666 F.2d at 1048. In this case, if the testimony of Hall and Gillman is credited, the statements made by the floor ladies were not ambiguous but clearly indicated that if the Union were voted in, the Company would close its doors and move.
 
 
 16
 Neither can the statements be considered trivial or "idle chatter" between friends in light of our reasoning in Okun Bros. In that case, we held that the statements of an assistant manager to the effect that employees' hours would be cut back if the union were voted in amounted to an unfair labor practice despite the employer's argument that the assistant manager had little authority and commanded no particular respect from the employees. Okun Bros., 825 F.2d at 106. Since the employees could have inferred that, as part of management, the assistant manager would have been privy to management plans, the statements tended to be coercive. Id. at 106-107. Though we find the facts in this case stronger than those in Okun Bros., the logic of Okun Bros. is controlling.
 
 
 17
 The Company also argues that the statements by Wells and Cochran could not have been unfair labor practices because they were mere opinions stated by persons with no real control. From Okun Bros. it is clear that even an opinion stated by a supervisory employee will amount to an unfair labor practice unless it is a statement of fact about a future event which the employer (as opposed to the speaker) is unable to control. Id. at 107; see NLRB v. Gissel Packing Co., 395 U.S. 575, 618 (1969).
 
 
 18
 Finally, the Company argues that the statements of the floor ladies cannot be substantial evidence of an unfair labor practice because the only evidence to establish such statements comes from the uncorroborated testimony of interested witnesses; viz., Hall and Gillman. Though we have stated that "[t]he uncorroborated testimony of an interested charging party does not amount to substantial evidence of an unfair labor practice," NLRB v. Container Corp. of America, 649 F.2d 1213, 1216 (6th Cir.1981) (per curiam), we have held that the uncorroborated testimony of an interested witness was substantial evidence of an unfair labor practice though it was contradicted by an opposing interested witness. Turnbull Cone Baking Co. v. NLRB, 778 F.2d 292, 297 (6th Cir.1985), cert. denied, 476 U.S. 1159 (1986) (citing NLRB v. Publishers Printing Co., 650 F.2d 859, 860 (6th Cir.1981); L'Eggs Products, Inc. v. NLRB, 619 F.2d 1337, 1343 (9th Cir.1980)). And, we have held that the testimony of an interested witness, if uncontradicted and found to be credible, can constitute substantial evidence to support a Board finding, whereas the testimony of an interested witness, if directly contradicted by the testimony of a disinterested witness, is rendered less than substantial. Union Carbide Corp. v. NLRB, 714 F.2d 657, 662 (6th Cir.1983).
 
 
 19
 We conclude that the testimony of Hall and Gillman was not rendered less than substantial merely by virtue of being uncorroborated testimony of interested witnesses. Accordingly, we hold that the testimony of Hall regarding statements by Cochran constituted substantial evidence because Hall's testimony was uncontradicted at the hearing and the ALJ found her testimony to be credible. See Union Carbide, 714 F.2d at 662.
 
 
 20
 A closer question is presented as to whether or not the testimony of Gillman concerning the statements made by Wells amounts to substantial evidence of an unfair labor practice. Gillman's testimony was contradicted by Wells, but there is no reason to believe that Wells, as part of management, was any less interested than Gillman. See Turnbull Cone, 778 F.2d at 297. Moreover, the ALJ found Wells' story that she removed the pro-union signs from Gillman's work area without having a conversation about the Union to be unbelievable.
 
 
 21
 We have been hesitant to find that uncorroborated testimony of an interested witness amounts to substantial evidence when that witness has been found untruthful concerning another aspect of the same case. NLRB v. Norbar, Inc., 752 F.2d 235, 242 (6th Cir.1985); Delco Air Conditioning Div. v. NLRB, 649 F.2d 390, 393 (6th Cir.1981). Concerning the issue of discrimination against union literature, the ALJ chose the Company's evidence over Gillman's testimony. However, the ALJ did not find Gillman to be untruthful--just unspecific.
 
 
 22
 Thus, we hold that Gillman's testimony concerning coercive statements made by Wells supplied substantial evidence of an unfair labor practice. Our conclusion is strengthened by Hall's uncontradicted testimony because it tends to corroborate the testimony of Gillman in that the testimony of both employees imputes to the floor ladies similar knowledge of upper level management plans to close down the factory in case of unionization.
 
 C.
 
 23
 We next consider whether there was substantial evidence for finding that the Company committed an unfair labor practice when it discharged Gillman. Where the allegation is discriminatory discharge for union activities, there must be substantial evidence to show that the employer's opposition to union activity was a "motivating factor" in the discharge. NLRB v. E.I. DuPont De Nemours, 750 F.2d 524, 529 (6th Cir.1984) (per curiam). "The Board may rely on all the evidence, including direct admissions as well as circumstantial evidence, in determining actual motive." Turnbull Cone, 778 F.2d at 297.
 
 
 24
 Anti-union motivation may reasonably be inferred from a variety of factors, such as a company's expressed hostility towards unionization together with knowledge of the employees' union activities, proximity in time between the employees' union activities and their discharges, the inconsistencies between the proffered reason and other actions of the employer, and disparate treatment of certain employees compared to other employees with similar work records or offenses.
 
 
 25
 Id. (citations omitted).
 
 
 26
 In effect, there are two versions of Gillman's discharge. If Watts is believed, Gillman was fired because she violated an established Company rule by leaving her work place without giving the Company notice. If Gillman is believed, she gave the Company notice by leaving a note on her supervisor's desk, and she was told that her union activity was the reason for her discharge. Gillman's testimony was self-serving, but it did not, and need not, stand alone.
 
 
 27
 There was evidence that the Company was hostile to union activities, and it was obvious that the Company knew of Gillman's union activities. Gillman's discharge came shortly after the Company was notified of her joining the organizing committee and only one week after her handing pro-union literature to the Company vice-chairman of the board. Also, given the sequence of events, the ALJ did not believe Watts' story that he checked for the note Gillman allegedly left.[2] Thus, he found that Watts' proffered reason for Gillman's discharge was inconsistent with his actions. The ALJ also believed that the Company treated Gillman differently than it had other employees with other similar offenses. The Company admitted that it hired back good employees for similar offenses and admitted that Gillman was a good employee. The refusal to rehire, being contemporaneous with the discharge, is some evidence of discriminatory motive. We find that Gillman's testimony plus the circumstantial evidence of discriminatory motive supplies substantial evidence of discriminatory discharge.
 
 D.
 
 28
 Finally, the Company argues that there was not substantial evidence for finding that it acted discriminatorily when it issued an unexcused absence form to Guadalupe Pickett and placed an unfavorable incident report in her personnel file. The Company's first argument is directed at the ALJ's characterization of the various pieces of paper work. The Company would have the ALJ not give the various documents ominous labels. When faced with the same arguments, the ALJ concluded that regardless of what the various documents were called, they were steps toward more severe discipline. We agree.
 
 
 29
 Secondly, the Company argues that the ALJ placed an unacceptable "spin" on the facts to arrive at his conclusion that the Company "set up" Guadalupe Pickett. The Company argues that the evidence is rendered less than substantial by the long chain of inferences between the fact that the Company knew Guadalupe Pickett could work only if Linda Pickett drove her and the conclusion that the Company arranged for Pickett to agree to work so that they could count her absent.
 
 
 30
 If the inferences were made in a total vacuum as the Company argues, the Company's argument would be more persuasive. However, the inferences were not made in a vacuum "in light of [the Company's] clear animus toward the Union and the members of its organizing committee." ALJ's Decision at 15. Since Pickett's characterization of the discipline was not encountered by an explanation from the Company, the ALJ concluded that anti-union animus was the motivating force. Because we believe a reasonable mind could accept the ALJ's conclusion, we hold there was substantial evidence that Pickett's discipline was an unfair labor practice. Universal Camera Corp., 340 U.S. at 477.
 
 III.
 
 31
 Accordingly, for the reasons stated, we grant enforcement of the Board's order.
 
 
 
 *
 Honorable William K. Thomas, Senior United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [1]
 Floor ladies are the lowest level statutory supervisors at the Company. In general, they work closely with the operators and have a friendly relationship. Floor ladies have no authority to hire and fire and little authority in regard to plant operations
 
 
 [2]
 The Company attempts to make much of the ALJ's reference to a portion of the Company handbook dealing with employee absences rather than unannounced departures. Though the reference did little to strengthen the ALJ's reasoning, we do not find that the reference undercuts his reasoning