**TURNBULL CONE BAKING COMPANY OF TENNESSEE, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 84–5930, 84–6035.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 3, 1985.

Decided Dec. 11, 1985.

David E. Walker (argued), Walker, Bordelon, Hamlin & Theriot, New Orleans, La., for petitioner.

Elliott Moore (argued), Pat Wynns, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for respondent.

Before MERRITT and JONES, Circuit Judges, and BROWN, Senior Circuit Judge.

PER CURIAM.

The Turnbull Cone Baking Company (Turnbull) seeks review of the decision of the National Labor Relations Board (NLRB) finding violations of sections 8(a)(1), (3), and (4) of the National Labor Relations Act and instructing Turnbull to reinstate twenty-three employees with back pay. The NLRB cross-applies for enforcement of its order. After studying the record and the arguments of the parties, we conclude that there is substantial evidence to support the Board's findings of fact and that there are no errors of law in its decision. Accordingly, we grant enforcement of the Board's order without modification.

I.

The facts of this case are well documented in the lengthy opinion of the administrative law judge (ALJ). Briefly, Turnbull had legitimate reasons to decrease the size

of its workforce when it streamlined operations and moved into a new plant. In preparation for these changes, Turnbull began to evaluate and re-train its employees. During this time a union organizing campaign began, which alarmed Turnbull. Its reaction to this campaign gave rise to the liability at issue here. Supervisors cautioned employees that participating in the campaign would bring adverse consequences, such as discharge, and warned them that the company might close. When management personnel saw employees visit the organizers' van, which was parked across the street from the company, the managers recorded this information in journals or internal memoranda. Notations were also made regarding the substance of employee conversations, such as a notation that an employee had been "talking union" during her break time. Supervisors also questioned employees about whether they had signed union authorization cards.

In addition, there was testimony, credited by the ALJ, that when a manager was asked by an employee why she was being laid off when employees with lower qualifications were retained, the manager responded that the laid-off employee had signed a union authorization card. There was also testimony, again credible, that after another employee's query regarding her layoff, the employee was asked whether she had signed a union card. At the first meeting of Turnbull employees at the union hall, a Turnbull manager was seen driving slowly back and forth in front of the hall. Several employees and employees' cars were visible to passing traffic. Shortly thereafter, there was a second wave of layoffs, despite management's assurances that the layoffs had ended. The remaining employees were then required to work overtime. Charges against Turnbull were filed with the NLRB.

As the hearing date approached, employee Raborn informed his manager that he was being called to testify for the General Counsel. One of the supervisors told an employee that Raborn would lose his job because he was testifying and was suspected of informing about company actions. A note was put in Raborn's file that he had been talking to another employee about the union. Raborn testified, and his union authorization card was admitted into evidence. Turnbull then transferred Raborn to the third shift and increased his workload. After four days, Raborn was discharged, ostensibly for poor performance and lack of cooperation.

Prior to his discharge, Raborn and employee Summers, who was also summoned to testify at the hearing, were seen conversing with employee Broadwell, who sometimes worked next to them. Broadwell was cautioned by her supervisor not to talk to Raborn and Summers frequently, because Broadwell was being watched by their manager, who suspected that Raborn and Summers were discussing the union with Broadwell. The manager later acknowledged concern about the union activities of Raborn and Summers, and instructed Broadwell not to speak at all to the pair, not even the slightest greeting. Eventually Broadwell protested this rule with some anger and vehemence. She was discharged for insubordination.

## II.

Turnbull asserted legitimate reasons for its selection of employees for layoff and for the discharges, such as poor quality or quantity of work, poor attitude, poor attendance, inability or reluctance to operate the new equipment, and insubordination. The ALJ considered each justification offered by Turnbull and found each one pretextual.

Where testimony conflicted, the ALJ made detailed credibility findings. These findings were based on demeanor, internal inconsistency of a witness's testimony, inconsistencies between the testimony of witnesses, and on Turnbull's failure to produce readily available documentation that would support an assertion. For example, Turnbull did not produce the performance evaluations that it completed shortly before the organizational campaign began, despite the fact that it asserted that certain em-

ployees were selected for the layoff on the basis of poor performance. Similarly, Turnbull did not produce time and payroll records to support other assertions that were disputed.

The ALJ concluded that Turnbull violated section 8(a)(1) of the NLRA by threatening employees with possible discharge, threatening to close the plant if the employees chose a union, interrogating employees about union activities, engaging in surveillance of a union meeting, imposing a discriminatory rule against conversation, and retaliating against an employee for testifying at an NLRB proceeding. The ALJ further concluded that Turnbull violated sections 8(a)(1) and (3) by choosing twenty-three employees for layoff and discharge on the basis of real or suspected union activities. In addition, the ALJ found that Turnbull also violated section 8(a)(4) in discharging Raborn. The ALJ found that in regard to six employees, there was insufficient evidence to show discriminatory treatment. The remedy included reinstating twenty-three employees with back pay.

On review by the Board, the ALJ's rulings, findings, conclusions and order were adopted in their entirety. The Board ordered Turnbull to take the actions set forth in the ALJ's order.

### III.

Before addressing the merits of the parties' arguments, we note that the scope of our review is limited. A reviewing court may not disturb the Board's findings of fact where there is substantial evidence on the record considered as a whole to support the Board's findings. 29 U.S.C. § 160(e), (f); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The Board's findings must be set aside when the record demonstrates that the Board's decision is not "justified by a fair estimate of the worth of the testimony of witnesses" or by the Board's "informed judgment on matters within its special competence or both." *Universal Camera*, 340 U.S. at 490, 71

S.Ct. at 466. When there is a conflict in the testimony, "it is the Board's function to resolve questions of fact and credibility," and thus this court ordinarily will not disturb credibility evaluations by an ALJ who observed the witnesses' demeanor. *NLRB v. Baja's Place*, 733 F.2d 416, 421 (6th Cir.1984).

The Board's application of the law to particular facts is also reviewed under the substantial evidence standard, and the Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion had the matter been before it *de novo*. *NLRB v. United Insurance Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision. *Universal Camera*, 340 U.S. at 477, 71 S.Ct. at 459. The appellate court should consider the evidence contrary to the Board's conclusions, but may not conduct *de novo* review of the record. *Union Carbide Corp. v. NLRB*, 714 F.2d 657, 660 (6th Cir.1983).

If the Board errs in determining the proper legal standard, the appellate court may refuse enforcement on the grounds that the order has "no reasonable basis in law." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979).

Section 7 of the Act, 29 U.S.C. § 157, provides in pertinent part:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....

Section 8(a)(1), 29 U.S.C. § 158(a)(1), provides that it "shall be an unfair practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." Section

8(a)(3), 29 U.S.C. § 158(a)(3), prohibits employers from discriminating against employees to discourage union membership. Section 8(a)(4), 29 U.S.C. § 158(a)(4), prohibits employer discrimination against employees for giving testimony before the Board.

It is well settled that an employer violates the Act by coercively interrogating its employees about their union activities, *NLRB v. E.I. DuPont De Nemours*, 750 F.2d 524, 527 (6th Cir.1984), by threatening loss of jobs for engaging in union activities, *NLRB v. Price's Pic-Pac Supermarkets*, 707 F.2d 236 (6th Cir.1983), and by maintaining surveillance of employee union activities. *NLRB v. Garon*, 738 F.2d 140, 143 (6th Cir.1984).

■ In addition, an employer violates the Act by implementing a rule to inhibit employees' union activities, *Price's Pic-Pac Supermarkets*, 707 F.2d at 237, or by imposing a rule to restrict discussion of union matters. *Union Carbide Corp. v. NLRB*, 714 F.2d 657, 663–64 (6th Cir.1983). As a matter of causation, there can be no finding of discrimination based on an employee's engaging in a protected activity unless the employer was aware of or suspected the employee's activity. *See A to Z Portion Meats v. NLRB*, 643 F.2d 390, 393 (6th Cir.1981).

■ Although there is no doubt that an employer commits an unfair labor practice when it discharges an employee for engaging in protected activities and gives pretextual reasons for the discharge, an employer's actions are not unlawful if his anti-union animus did not contribute to the discharge. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 398, 103 S.Ct. 2469, 2472, 76 L.Ed.2d 667 (1983). Accordingly, once the General Counsel has demonstrated that the employee's protected activity was a substantial or motivating factor in the adverse action, the employer may then avoid liability if it can prove by a preponderance of the evidence that there were independent, legitimate reasons for the decision. *Id.* at 398–401, 103 S.Ct. at 2472–2474. Thus, in a mixed motive or dual motive case, where there is both anti-

union animus and a legitimate non-discriminatory reason for the adverse action, the burden of proof shifts to the employer to prove that the adverse action would have occurred in any event for the valid reasons stated. *Id.* at 400–03, 103 S.Ct. at 2473–75 (approving this allocation of the burden of proof in mixed motive cases, which was set forth by the Board in *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982)).

Turnbull argues before us, as it did before the NLRB, that the sole criterion in each case for selecting an employee for layoff/dismissal was a lawful reason, such as quality or quantity of work, attitude, availability of jobs in the new plant that matched the employee's skill and training, or whether the employee happened to be a member of a shift that was discontinued. In contrast, the Board claims that the sole motivating factor was the employee's involvement in the union's organizing campaign. The ALJ appears to have credited aspects of both contentions, in that she acknowledged a legitimate motive for discharging *some* workers (the move to the new plant), but found that the workers actually terminated or laid-off had been selected for illegal reasons (their real or suspected union activity).

■ Turnbull's argument for reversal on this point is that the ALJ failed to employ a formal *Wright Line* analysis, and therefore that her conclusions are legally erroneous. This argument focuses on the form of *Wright Line* and ignores its substance. *Wright Line* established an *affirmative* defense for employers charged with violations of the NLRA. After employees show a prima facie violation, the employer may escape liability by proving that the action against employees would have occurred, for legitimate business reasons, even in the absence of anti-union sentiment. *Transportation Management*, 462 U.S. at 401–02, 103 S.Ct. at 2474. In this case, the ALJ found not only that Turnbull had failed to meet this burden of proof; she affirmatively found that the discharges in question

were motivated by anti-union animus. This finding, which we find was supported by substantial evidence, necessarily rejected Turnbull's proffered business justification defense. Accordingly, if there was error in failing to follow the burden-shifting procedures outlined in *Wright Line*, the error was harmless, since the ALJ at least found that Turnbull had failed to prove its affirmative defense.

Turnbull next argues that there was insufficient evidence of its anti-union animus or its awareness of certain employees' union activities. It further argues that the ALJ erred in crediting the testimony of a single interested party, an employee, over the testimony of supervisors.

■ ■ The Board may rely on all the evidence, including direct admissions as well as circumstantial evidence, in determining actual motive. *Dupont,* 750 F.2d at 529. Circumstantial evidence alone may be sufficient. *Id. NLRB v. Price's Pic-Pac Supermarkets, Inc.* 707 F.2d 236, 240 (6th Cir.1983). Anti-union motivation may reasonably be inferred from a variety of factors, such as a company's expressed hostility towards unionization together with knowledge of the employees' union activities, *Dupont,* 750 F.2d at 529; *NLRB v. Supreme Bumpers, Inc.,* 648 F.2d 1076, 1077 (6th Cir.1981), proximity in time between the employees' union activities and their discharges, *Dupont,* 750 F.2d at 529; *NLRB v. Garon,* 738 F.2d 140, 147 (6th Cir.1984), the inconsistencies between the proffered reason and other actions of the employer, *NLRB v. Evans Packing Co.,* 463 F.2d 193, 195–96 (6th Cir.1972), and disparate treatment of certain employees compared to other employees with similar work records or offenses. *Supreme Bumpers,* 648 F.2d at 1077. Furthermore, where an employer's representatives have announced an intent to discharge or otherwise retaliate against an employee for engaging in protected activity, the Board has before it especially persuasive evidence that a subsequent discharge of the employee is unlawfully motivated. *NLRB v.*

*Armstrong Circuit, Inc.,* 462 F.2d 355, 356 (6th Cir.1972) (supervisor's statement that discharge was related to union activities); *L'Eggs Products, Inc. v. NLRB,* 619 F.2d 1337, 1343 (9th Cir.1980) (finding that statement of anti-union motive eliminates question concerning validity of proffered legitimate reason for adverse action).

■ In *Union Carbide Corp. v. NLRB,* 714 F.2d 657, 662 (6th Cir.1983), this court indicated that the reliability of the uncorroborated testimony of an interested witness is open to question where it is directly contradicted by the testimony of a disinterested witness. It appears, however, that the management personnel here may not have been completely disinterested, and we find, moreover, that the ALJ's credibility findings are consistent with a reasonable reading of the record. *See NLRB v. Publishers Printing Co.,* 650 F.2d 859, 860 (6th Cir.1981) (Board may credit discriminatee's self-serving and uncorroborated testimony; manager's contrary testimony may be equally self-serving); *L'Eggs Products,* 619 F.2d at 1343 (same). Accordingly, we find no basis for overturning the credibility determination of the ALJ. We likewise find, in regard to the question of sufficiency, that the determinations of the Board are supported by substantial evidence.

In sum, we hold that the decision of the Board was supported by substantial evidence and that the Board committed no errors of law. We therefore grant enforcement of the Board's order without modification.