**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**AQUATECH, INC., Respondent.**

**No. 90–5563.**

United States Court of Appeals, Sixth Circuit.

Submitted Jan. 28, 1991.

Decided Feb. 25, 1991.

Aileen A. Armstrong, Deputy Associate General Counsel, Charles P. Donnelly, Jr., Margaret E. Luke, N.L.R.B., Office of the General Counsel, Washington, D.C., Frederick Calatrello, Director, N.L.R.B., Region 8, Anthony J. Celebrezze, Cleveland, Ohio, for petitioner.

Stephen A. Markus, Robert J. Van Der Velde, Stephanie E. Trudeau, Ulmer & Berne, Cleveland, Ohio, for respondent.

Before MILBURN and GUY, Circuit Judges; and BROWN, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

This case is before the court upon the application of the National Labor Relations Board (NLRB or Board) for enforcement of its order issued against Aquatech, Inc. (Aquatech), an Ohio corporation and manufacturer of sewer cleaning equipment. The Board adopted an administrative law judge's (ALJ) finding that Aquatech violated section 8(a)(3) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(3), by discharging employees Robert Naujoks, Charles Naujoks, John Pocius, Michael McAlpine, and Cottrell Glaze in retaliation for their union activities. The Board also adopted the ALJ's finding that Aquatech had violated section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by engaging in conduct intended to interfere with, restrain, and coerce employees in exercising their rights under section 7 of the Act.[1] The Board ordered Aquatech to cease and desist from unfair labor practices and from in any like manner interfering with, restraining, or coercing employees in the exercise of their statutory rights, and further ordered Aquatech to offer reinstatement with backpay to the five employees found by the Board to have been improperly discharged.

Aquatech argues that the discharges were not in retaliation for union activity, but were proper and based on well-documented violations of company policies, and asks this court for an order denying

---

1. Section 7 of the Act gives employees the right to organize, form, join, or assist any union, to bargain collectively through representatives of their own choice, to act together for other mutual aid or protection, and to choose not to engage in any of these protected concerted activities. 29 U.S.C. § 157.

the application and vacating the Board's order. Specifically, Aquatech argues that (1) John Pocius did not fall within purview of the Act because he was a supervisor; (2) that the general counsel failed to establish that the discharge of Michael McAlpine was motivated by anti-union animus, because no evidence was presented that Aquatech knew McAlpine supported the union; (3) that the evidence overwhelmingly establishes that Cottrell Glaze and Charles Naujoks would have been terminated for violations of Aquatech's attendance policy even if they had not supported the union; and (4) that Robert Naujoks was properly terminated for violating Aquatech's no-solicitation rule.

Upon review we conclude that the Board's order is supported by substantial evidence and is in accordance with law, and we order enforcement.

### I.

The general counsel for the Board, acting on behalf of the charging party, United Steelworkers of America (the union), commenced this action by alleging that Aquatech improperly terminated eight employees and engaged in certain other improper conduct during the course of a union organizing campaign.[2] Aquatech denied the allegations, and the ALJ conducted a hearing where witnesses and documentary evidence were presented by counsel for both sides.[3]

The events giving rise to this action began in late July 1988 when Hank Shaffer, a tow motor operator, initiated a union organizational campaign. He began by asking his co-workers if they would be interested in joining a union. After receiving many affirmative responses, Shaffer contacted the United Steelworkers and arranged to meet with a business agent several days later. At this meeting, the agent provided Shaffer with authorization cards. While on breaks over the next 10 days, Shaffer distributed the cards to a large number of employees and ultimately obtained signatures from approximately 75 percent of the workforce. He also gave batches of cards to several volunteers who then solicited authorizations from the workers in their respective departments. Later in the month, Shaffer and his group of volunteer assistants also distributed union buttons and other union paraphernalia.

Among those employees assisting Shaffer in the union organizing drive were John Pocius; Robert Naujoks; and Robert's brother, Charles Naujoks. Employees Michael McAlpine and Cottrell Glaze also were supporters; they signed authorization cards and attended meetings, and Glaze wore a union button. Shaffer and the employees who distributed union materials routinely met together on break times and at lunchtime to discuss their progress. Several supervisors observed employees meeting and carrying out their organizational activities.

Sometime in late August, union representative Al Capone contacted Aquatech's owner, Ben Fisco, Jr., to request recognition. Shortly thereafter, on September 1, Fisco held meetings with two separate groups of plant employees. Accounts of Fisco's remarks delivered to approximately 50 employees at the first of these meetings are uncontroverted. Fisco stated bluntly that the shop was his, that he had run his

---

**2.** Although the complaint alleged that eight employees were improperly discharged, the order that the board seeks to enforce concerns only five discriminatory discharges. The ALJ dismissed the general counsel's claim that David Rodriguez was terminated because of his support for the union, on the basis that there was no evidence that the employer was aware of Rodriguez' union activity. The ALJ also dismissed, prior to the order and upon motion of Aquatech, the general counsel's allegation that the employment terminations of Clarence Tufts and Thomas Wargo were discriminatory discharges.

**3.** Details of the events at issue are derived in part from the record and in part from the ALJ's decision and order adopted by the Board. Although Aquatech contests some aspects of the ALJ's factual conclusions, "'it is the Board's function to resolve questions of fact and credibility where there is a conflict in the testimony.'" *Kux Mfg. Co. v. NLRB,* 890 F.2d 804, 808 (6th Cir.1989) (quoting *NLRB v. Baja's Place,* 733 F.2d 416, 421 (6th Cir.1984)). Accordingly, we shall set forth the facts as determined by the ALJ and adopted by the Board, and address Aquatech's objections in due course.

business without a union, and would continue to do so. He asserted that he would have no difficulty in identifying those who signed authorization cards and suggested the employees could still withdraw them. He further stated that if the union succeeded in its representational efforts, he would refuse to agree to a union shop or dues checkoff and would insist on mandatory drug testing. Fisco also remarked that he believed he had treated his employees fairly and saw no reason why they needed a union. He then assured the employees that he had an open door policy and that any time an employee wished to discuss anything with him, he would be glad to do so.

Before the meeting concluded, a number of employees asked why they had not received pay raises. Fisco responded that he had no knowledge of their pay scales but would look into the matter. Other employees complained about squalid conditions in the plant lunchroom and restrooms. Fisco promised improvements and Aquatech began to address these complaints the next day. The restrooms, lunchroom, and picnic tables were painted, and pipes were unclogged in the restrooms. A week or two later, curtains were hung in front of restroom stalls to provide privacy, and later still, leaky and non-functioning toilets were repaired.

All five employees at issue—McAlpine, Robert Naujoks, Charles Naujoks, Glaze and Pocius—were discharged by Aquatech during the same two-day period commencing on September 8 and ending on September 9. It is necessary to address separately the events leading to the discharge of each employee.

McAlpine, who was the first of the five employees to be discharged, began working as a machinist for Aquatech on July 7, 1985. He received a pay raise when he was promoted to work on a burning table, but after that he often asked his supervisor, Gary Skaggs, about another raise. On one occasion, he protested that his predecessor at the burning table had earned much more than he had. When Skaggs expressed disbelief, McAlpine urged him to check the records.

During the 1988 union organizing drive, McAlpine attended two union meetings. At one point, while union adherent Shaffer and he were on a lunch break at a location away from the plant, Shaffer gave McAlpine a union authorization card. Upon McAlpine's return to work, he placed the unsigned card on his work table where he kept his paperwork. Skaggs customarily placed work orders on McAlpine's work table near McAlpine's work station. Later that same day, McAlpine signed the authorization card and gave it to Shaffer as Shaffer was leaving work.

On September 8, the day he returned from a week's vacation, McAlpine was informed by Skaggs that he was being terminated for poor attendance and bad work habits. McAlpine protested that his work was good, that he was far more efficient than two employees he had trained on the burning table, and that he never had a poor attendance record.

Robert Naujoks served as one of the principal organizers during the union campaign, distributing authorization cards he received from Shaffer as well as union buttons, stickers, and other paraphernalia. He testified without contradiction that he engaged in this activity solely during break periods or before and after work. On one such occasion, a foreman, Silvio Alarcon, observed him handing an authorization card to an employee. In addition, Naujoks related that a small band of employees who were actively engaged in union campaigning often met during breaks to discuss their activities in an area which was easily observed by supervisors.

On September 9, in the presence of plant manager John Manes and several other supervisors, Naujoks received a separation notice which stated that he had violated company regulation 6 (attendance), company rule 9 (soliciting, distribution, littering), and company rule 13 (quality of work). Naujoks denied that he had violated these rules and asked to speak with Manes privately. Manes seized the separation notice

and added the comment, "Also threatened a supervisor."

Naujoks testified that his work performance had been rated as "excellent" and that he was slated to be classified "at the top of the list" of welders. No evidence was presented at the hearing to show that Naujoks had breached Aquatech's attendance policy or produced shoddy work. Similarly, Aquatech produced no evidence that he had violated rule 9 by distributing union materials during non-working times in non-working areas. Company rule 9, proscribing solicitation, reads as follows:

> There shall be no collecting or soliciting of any kind during the time employees are expected to be working. There shall be no distribution of literature at any time in work areas, nor in any place or manner which constitutes littering....

Like his brother Robert, Charles Naujoks also campaigned for the union, soliciting signatures on authorization cards and distributing union buttons and literature during lunch breaks and before and after work. On September 9, prior to starting work, Charles gave a union button to a new employee known to him as Ed. Ed happened to work on the same piece of equipment as the father of plant manager Manes. As soon as the senior Manes saw the button, he took it from Ed and went to his son's office. Immediately thereafter, Ed was summoned to Manes' office. Later the same day, Charles Naujoks asked his foreman, Frank Manfredonia, whether he would be discharged, explaining that Manes knew he had distributed some union material. Naujoks acknowledged to Manfredonia that he supported the union.

On the afternoon of that same day, Manfredonia handed Naujoks a termination notice which said that the reasons for his discharge were that he had violated company rules 9 and 13, regarding solicitation and quality of work. Although the termination notice asserted that Naujoks' quality of work and production had deteriorated by 75 percent, no testimonial or documentary evidence was produced to support this assertion. Similarly, no evidence was produced other than the separation notice to suggest that Charles Naujoks had violated the rule against solicitation.

Although Charles Naujoks' separation notice mentions that his attendance was poor, it does not list poor attendance as a reason for his discharge. However, Aquatech spent considerable time on this issue during cross-examination of Naujoks. Aquatech's brief, both before the ALJ and before this court, focuses exclusively on his attendance record for the grounds for discharge. Regulation 6 of Aquatech's attendance policy reads in pertinent part as follows:

> After the probationary period, absence from work in excess of 1 day a month or 12 days a year or tardiness in excess of 2 days a month or 20 days a year may be cause for disciplinary action or termination....

Charles Naujoks' attendance record was not exemplary. In 1987 he received several written disciplinary warnings for excessive tardiness and absenteeism in violation of company policy. The parties agree that, although he was not late at all in the three months preceding his discharge, he was absent twice in June, once in July, and twice in August, the last absence occurring on August 8. However, at no time in 1988 did he receive any warnings or suspensions for absenteeism or tardiness, and no evidence was introduced to show that he was absent from August 9 to the date of his discharge on September 9.

Cottrell Glaze, a drive shaft specialist and the only employee experienced in fabricating drive shafts for Aquatech trucks, worked in that capacity without immediate supervision. He spent any spare time in the machine shop under the supervision of foreman Gary Skaggs.

Glaze signed a union authorization card and openly wore a union badge. Immediately following the September 1 meeting, Glaze approached Fisco and asked for a wage increase, proposing that he receive a commission for each completed drive shaft. Fisco said he would consider the matter after Glaze was evaluated. Glaze also admitted to Fisco that he had signed a union card.

At the end of the workday on September 9, Skaggs told Glaze that he was fired for poor attendance. His notice of separation attributes his discharge to a violation of regulation 6 governing absenteeism and tardiness. The notice also stated that "Glaze was given a warning with a 30–day probationary period on July 22, 1988. During that time he has violated the Aquatech Company Policy." Other than the July 22 warning, all of Glaze's previous written disciplinary actions were received during 1987. The probationary status was instituted after Glaze had returned from 28 days spent at an alcohol and drug treatment program in May, for which the company permitted Glaze leave from his work.

The written disciplinary action issued to Glaze on July 22 indicated that the probationary status resulted from the violation of numerous company policies, including the attendance policy. Documentary evidence demonstrates that Glaze had a tardiness problem, and he testified that he was tardy four times in both June and July 1988, subsequent to his treatment program. During the 1988 probationary period, he was late on seven occasions. His attendance records also reflect absences on July 30 and August 20, both of which dates fell on Saturday. Glaze explained without contradiction that in June, when he had requested permission for a one-week vacation, Manes told him that Aquatech could not permit him to take his vacation days all at one time. Instead, he could take them periodically. Skaggs added that Glaze could take leave one day a week, preferably on Friday or Saturday, with one day advance notice. Glaze testified that he believed his absences during his probationary status were vacation days, although he gave notice only on the morning of those days.

John Pocius was fired ostensibly for violating company rule 13 (quality of work). However, Aquatech produced no evidence to support this assertion and does not contest the ALJ's finding that Aquatech was aware of Pocius' active support of the un-

ion. Instead, Aquatech has defended the discharge of Pocius solely on the ground that Pocius' duties as a leadman bring him within the Act's definition of a supervisor, and therefore he is not entitled to the Act's protections.[4]

As a leadman, Pocius received instructions from his foreman about the work to be performed and priority assignments. He, in turn, delegated various tasks to workers depending on their particular skills. He offered training to new employees and generally gave guidance to employees who might need assistance. At the end of the workday, he prepared reports describing the work completed during his shift and gave these reports to the second shift. He also made sure that parts were available for his crew as well as the second shift workers.

Pocius spent each full day performing manual labor side-by-side with his fellow employees, and many overtime hours as well, putting in an average of 60 hours a week. He was paid hourly and received time and one-half for overtime, just as his co-workers did. The record contains no evidence that he ever hired or recommended hiring anyone. Further, there is no evidence that he disciplined, transferred, assigned overtime, promoted or otherwise rewarded any employee, adjusted any grievances, or effectively recommended that such actions be taken. He was not included in supervisory meetings.

As proof of Pocius' authority, Aquatech introduced a separation notice regarding one employee, alleging that Pocius had signed it in a supervisory capacity. According to the testimony of Pocius, Manes had asked him his opinion of an employee who had worked only four days for Aquatech, whereupon Pocius replied somewhat noncommittally that given time the employee would improve. Subsequently, Manes fired the employee but left the plant before signing his separation notice. Consequent-

---

**4.** The unfair labor practices prohibited by 29 U.S.C. §§ 158(a)(1) and (3) apply to employees. "'Employees' ... shall not include any individu-

al employed as ... a supervisor...." 29 U.S.C. § 152(3).

ly, another supervisor requested that Pocius sign the sheet in Manes' absence.

Based on the foregoing facts, the ALJ issued its decision and order, and Aquatech filed exceptions to that decision and order. A three-member panel, to whom the Board delegated its authority in the proceeding, affirmed and adopted the ALJ's decision and order.

## II.

"The scope of our review of Board findings is well-established: Where there is substantial evidence in the record as a whole to support the Board's conclusions, they may not be disturbed upon appeal." *Kux Mfg. Co. v. NLRB*, 890 F.2d 804, 808 (6th Cir.1989). Thus, the Board's findings of fact and its "application of the law to the facts" are subject to the substantial evidence test. *NLRB v. Ohio Masonic Home*, 892 F.2d 449, 451 (6th Cir.1989). " 'Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision.' " *Emery Realty, Inc. v. NLRB*, 863 F.2d 1259, 1262 (6th Cir.1988) (quoting *Roadway Express, Inc. v. NLRB*, 831 F.2d 1285, 1289 (6th Cir.1987)). When there is a conflict in the testimony, "it is the Board's function to resolve questions of fact and credibility," and this court ordinarily will not disturb credibility evaluations of the Board or an ALJ, who has observed the witnesses' demeanor. *NLRB v. Baja's Place*, 733 F.2d 416, 421 (6th Cir.1984). "[T]he Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion had the matter been before it *de novo.*" *Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 295 (6th Cir.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2277, 90 L.Ed.2d 720 (1986).

## III.

The ALJ found that Aquatech had violated section 8(a)(1) of the Act, 29 U.S.C.

§ 158(a)(1),[5] by engaging, through its owner Ben Fisco, Jr., in the following conduct intended to interfere with, restrain, and coerce employees in exercising their rights under section 7 of the Act: threatening employees with surveillance by suggesting that he would identify employees who signed authorization cards; threatening employees that he would demand mandatory drug testing if he was compelled to engage in collective bargaining; threatening to refuse to negotiate in good faith if the union prevailed in an election; and soliciting and then remedying employee grievances.

Aquatech directs its entire argument on appeal to the Board's finding that the discharge of five employees violated section 8(a)(3). By failing to address or take issue with the Board's findings and conclusions with regard to the section 8(a)(1) violations based upon threatening and coercive behavior, the company has effectively abandoned the right to object to those determinations. *NLRB v. Valley Plaza, Inc.*, 715 F.2d 237, 240–241 (6th Cir.1983); *NLRB v. Tennessee Packers, Inc.*, 344 F.2d 948, 949 (6th Cir. 1965). We therefore summarily affirm these findings and enforce the related portion of the order requiring Aquatech to cease and desist from the unfair labor practices found, and from in any like manner interfering with, restraining, or coercing employees in the exercise of their statutory rights.[6]

## IV.

Section 8(a)(3) of the Act provides that "[i]t shall be an unfair labor practice for an employer ... by discrimination in regard to hire or tenure of employment ... to ... discourage membership in any labor organization...." 29 U.S.C. § 158(a)(3). Thus, an employer's discharge of an employee for engaging in union activity violates the Act. *Birch Run Welding & Fabricating, Inc. v.*

---

**5.** According to section 8(a)(1), "[i]t shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights [to form, join, and assist labor organizations] guaranteed in [29 U.S.C. § 157]." 29 U.S.C. § 158(a)(1).

**6.** Even were we to address this issue, we would find the conclusion that Aquatech violated section 8(a)(1) of the Act to be supported by substantial evidence.

*NLRB*, 761 F.2d 1175, 1179 (6th Cir.1985); *Coil–A.C.C., Inc. v. NLRB*, 712 F.2d 1074, 1076 (6th Cir.1983). Conversely, "an employer's actions are not unlawful if his anti-union animus did not contribute to the discharge." *Turnbull Cone*, 778 F.2d at 296.

To establish a violation of section 8(a)(3), the Board's general counsel must "make a prima facie showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct." *Lawson Co. v. NLRB*, 753 F.2d 471, 476 (6th Cir.1985) (quoting *Wright Line, Inc.*, 251 NLRB 1083, 1089 (1980), *enforced as modified sub nom. NLRB v. Wright Line*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982)); *accord NLRB v. Transportation Management Corp.*, 462 U.S. 393, 400–03, 103 S.Ct. 2469, 2473–75, 76 L.Ed.2d 667 (1983). In ascertaining the employer's motivation, "[t]he Board may rely on all the evidence, including direct admissions as well as circumstantial evidence[.]" *Turnbull Cone*, 778 F.2d at 297. In *Turnbull Cone*, we unequivocally established that "[c]ircumstantial evidence alone may be sufficient" to prove a section 8(a)(3) transgression. *Id.*

### A.

Aquatech argues that the general counsel failed to carry its burden of presenting a *prima facie* case that Michael McAlpine was discharged due to his union activities, because no evidence exists that Aquatech knew McAlpine supported the union. Therefore, according to Aquatech, the burden should never have been shifted to Aquatech to show that McAlpine would have been discharged absent his union activities.

"As a matter of causation, there can be no finding of discrimination based on an employee's engaging in a protected activity unless the employer was aware of or suspected the employee's activity." *Turnbull Cone*, 778 F.2d at 296. However, "the Board may properly infer knowledge when that inference is drawn from substantial evidence." *A to Z Portion Meats, Inc. v. NLRB*, 643 F.2d 390, 393 (6th Cir.1980) (On Motion for Clarification) (1981). In *A to Z*, we held that an inference of prior knowledge, based solely on the Board's disbelief of an employer's stated reasons for the discharge, is not an inference supported by substantial evidence and is tantamount to compelling the company to disprove prior knowledge. *Id.* at 393.

In *A to Z*, there was no evidence that the employer knew of *any* unionization efforts, whereas in this case, the employer knew and vocally opposed the union activities. Furthermore, unlike *A to Z*, in order to infer prior employer knowledge of McAlpine's union activity, the Board did not rely solely on its disbelief of Aquatech's stated reasons for the discharge. The ALJ found that the employer's knowledge that one of the principal grievances concerned pay raises, particularly after the September 1 meeting where Fisco investigated the sentiment behind the union's request for recognition, coupled with McAlpine's repeated requests for a raise, were facts supporting the inference that the employer knew McAlpine favored the union. McAlpine also testified that he left his authorization card on his work table where it could have been seen by his supervisor, Skaggs, who routinely placed work orders on that table.

As we have already stated, circumstantial evidence alone may be significant, *Turnbull*, 778 F.2d at 297, and anti-union motivation may be inferred from a variety of factors, including the proximity of time between the employees' union activity and their discharge. *Id.* The abruptness of McAlpine's discharge when he returned from a vacation, one week after the union's request for recognition, as well as the fact that he was discharged the day before other union adherents, is evidence supporting an inference of prior knowledge. When this evidence is combined with the fact that no evidence was introduced to support Aquatech's assertion of poor work per-

formance or poor attendance, we find that there is substantial evidence to support the inference of prior knowledge of McAlpine's union activity, and that his discharge was motivated by anti-union animus.[7]

### B.

With respect to Charles Naujoks and Cottrell Glaze, Aquatech does not dispute that it had knowledge of their union activity. Under the circumstances, the company's expressed hostility towards the union, and the proximity in time of Glaze's and Naujoks' protected activity and their discharge, suggest improper motivation. *See Grand Rapids Die Casting Corp. v. NLRB*, 831 F.2d 112, 117 (6th Cir.1987); *NLRB v. E.I. DuPont De Nemours*, 750 F.2d 524, 529 (6th Cir.1984). Aquatech attempts to rebut the inference of improper motivation by arguing that Naujoks and Glaze would have been discharged on the basis of their unsatisfactory attendance records even if they had not engaged in union activities.

Aquatech presented evidence of, and the ALJ acknowledged that, both Naujoks and Glaze had violated Aquatech's attendance policy. The attendance policy warns employees that absences from work in excess of one day a month, or tardiness in excess of two days a month, is reason for disciplinary action or termination. Naujoks and Glaze clearly violated this policy. In the three months preceding his discharge, Naujoks was absent twice in both June and August 1988, and had received numerous disciplinary warnings in 1987 for violation of the policy. Concerning Glaze, in addition to the disciplinary action leading to his probationary status, which was based in part on violations of regulation 6 governing

attendance and tardiness, he was tardy seven times and absent twice during the 30–day probationary period.

■ The ALJ nevertheless rejected Aquatech's proffered business justification defense and ruled that the discharges in question were motivated by anti-union animus. In part, the basis for this conclusion is the proximity in time of the protected activity and the discharges, and the hiatus between the violations and the disciplinary action: Aquatech waited approximately two and one-half weeks after the end of Glaze's probationary period before terminating him; Aquatech waited to discharge Naujoks until four weeks after his last violation of the attendance policy. The ALJ found the hiatus significant because it found that ordinarily "discipline was imposed within a day or two of the date on which the offending conduct occurred."

Based on the foregoing reasons and the fact that Cottrell Glaze had skills possessed by no other worker, the ALJ decided that Aquatech had failed to carry the burden of showing that Glaze would have been discharged absent the union activity. The propriety of this finding is a close question. Although the burden is on the employer to prove that it was properly motivated once the Board has shown significant improper motivation, the Board may not reject the employer's proof absent a reasonable basis, *see NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666, 671 & n. 12 (1st Cir.1979), but must fully weigh all reasonable bases for the company's action. *TRW, Inc. v. NLRB*, 654 F.2d 307, 312 (5th Cir. 1981). This is particularly true here, where the evidence supporting Glaze's violations of the company's attendance policy is substantial and well-documented.

---

**7.** Aquatech misplaces reliance on *TRW, Inc. v. NLRB*, 654 F.2d 307 (5th Cir.1981), in arguing that the Board's inference of company knowledge was not based on substantial evidence. Unlike the instant case, in *TRW* there was specific and abundant evidence of poor work performance, poor attendance, and poor attitude. *Id.* at 310–11. The Fifth Circuit found that there were no facts establishing that the discharges at issue were due to anti-union prejudice, and that merely characterizing the employer's actions as pretextual based on suspicion, conjecture, and

speculation, "does not satisfy the responsibility of fully weighing all reasonable bases for that action." *Id.* at 312. Here, Aquatech offers no evidence to support its stated reasons for McAlpine's discharge—poor attendance and work performance. Where there is evidence supporting the inference of discharge for having engaged in union activity, and the employer has no other basis for the discharge, or if the reasons that he proffers are pretextual, the employer violates the Act. *See NLRB v. E.I. DuPont De Nemours*, 750 F.2d 524, 529 (6th Cir.1984).

Although discriminatory application or lax administration of policies may indicate that employees are being singled out for union activities, *see NLRB v. Bliss and Laughlin Steel Co.*, 754 F.2d 229, 236 (7th Cir.1985), the only evidence of disparate treatment that the general counsel points to is the finding by the ALJ that normally Aquatech dispensed discipline within a day or two of violations. The ALJ cited two disciplinary actions received by Charles Naujoks to support this conclusion, but the record also contains disciplinary actions that were dated 10, 11, and 14 days after the end of the month in which the violations occurred. This alone is hardly a reasonable basis upon which to infer improper motive. In addition, the fact that Glaze may have possessed skills coveted by the company would reasonably make Aquatech reluctant to discharge him regardless of whether the reason for discharge was his continuing attendance problems or his union activity.

Nevertheless, we are still left with the fact that Glaze was not finally discharged, despite a history of attendance problems, until he engaged in union activity, and this discharge was in tandem with the discharge of other union adherents. "An inference of anti-union animus is proper when the timing of the employer's actions is 'stunningly obvious.' " *NLRB v. American Geri–Care, Inc.*, 697 F.2d 56, 60 (2d Cir.1982), *cert. denied*, 461 U.S. 906, 103 S.Ct. 1876, 76 L.Ed.2d 807 (1983) (quoting *NLRB v. Long Island Airport Limousine Serv. Corp.*, 468 F.2d 292, 295 (2d Cir. 1972)); *see NLRB v. Advanced Business Forms Corp.*, 474 F.2d 457, 465 (2d Cir. 1973) (timing and abruptness of discharge are persuasive evidence of motivation). While the ALJ's conclusion is not the only plausible inference that can be drawn from the record, and is not necessarily the inference we would draw, it was certainly a permissible one.

■ Charles Naujoks' discharge does not present as close a question. No proof was offered to support the reasons stated for discharge on Naujoks' separation notice (rules 9 and 13 concerning solicitation and

quality of work), and Aquatech relies solely on the attendance violations as the basis for a properly motivated employment discharge. Although, like Glaze, Naujoks violated the attendance policy, unlike Glaze, Naujoks' separation notice does not list poor attendance as a reason for discharge, and he at no time during 1988 received any warning or suspension for absenteeism or tardiness. Anti-union animus may be inferred from the inconsistencies between the proffered reason and other actions of the employer. *Turnbull Cone*, 778 F.2d at 297 (citing *NLRB v. Evans Packing Co.*, 463 F.2d 193, 195–96 (6th Cir.1972)). The inconsistency, when combined with the several factors considered by the ALJ—the company's expressed hostility towards unionization; Aquatech's knowledge of Naujoks' union activity; the timing of the discharge, both with respect to other discharges and the length of time since the attendance violations; and the lack of warnings in 1988, when warnings for Naujoks' attendance violations were the routine in 1987—present substantial evidence to support the conclusions of the ALJ and the Board.

### C.

The circumstances and timing of Robert Naujoks' discharge support the inference that Aquatech violated section 8(a)(3) of the Act by terminating him for engaging in union activity. *See NLRB v. Allen's I.G.A. Foodliner*, 651 F.2d 438, 440 (6th Cir.1981). Aquatech does not dispute its knowledge of Naujoks' union activity, nor does Aquatech contradict that Naujoks' work performance was rated excellent. Yet, Naujoks was terminated on the September 9, 1985, the same day that his brother Charles, Glaze, and Pocius received their separation notices. Thus, Aquatech must demonstrate that Naujoks' termination would have taken place even in the absence of the protected conduct.

■ Although Naujoks' separation notice cited rules governing attendance, solicitation, and work performance as the reasons for discharge, on appeal, Aquatech relies solely on the no-solicitation rule to

justify the termination. Aquatech makes much of the fact that Naujoks admitted to distributing union materials. However, this conduct alone does not constitute a violation of Aquatech's no-solicitation rule, which prohibits soliciting "during time employees are expected to be working" and the distribution of literature "at any time in work areas." Aquatech introduced no evidence to contradict Naujoks' testimony that he distributed union materials only during break periods or before or after work. The record presented to this court does not indicate whether Naujoks distributed literature in work areas, albeit on his own time, and Aquatech does not argue or point to any evidence that he did so.[8] Accordingly, we find that there is substantial evidence in the record to support the Board's conclusion that Robert Naujoks was unlawfully terminated.

### V.

■ Aquatech's challenge to the Board's finding with respect to John Pocius rests solely on the ground that Pocius is a supervisor and not entitled to the protections of the Act. Section 2(11) of the Act defines a "supervisor" as follows:

The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). The kinds of supervisory authority enumerated in this section are in the disjunctive but, regardless of the specific kinds of supervisory authority at issue, its exercise must involve the use of true independent judgment in the employ-

er's interest before such exercise of authority becomes that of a supervisor. *NLRB v. Lauren Mfg. Co.*, 712 F.2d 245, 247–248 (6th Cir.1983); *Beverly Enter. v. NLRB* 661 F.2d 1095, 1098 (6th Cir.1981).

The question of supervisory status is "a mixed one of fact and law." *Beverly Enter.*, 661 F.2d at 1099. However, as is evident from the array of criteria within section 2(11), the inquiry is predominantly factual. *Id.* Furthermore,

[e]veryday experience in the administration of the statute gives [the Board] familiarity with the circumstances and backgrounds of employment relationships in various industries, with the abilities and needs of the workers for self-organization and collective action, and with the adaptability of collective bargaining for the peaceful settlement of their disputes with their employers. The experience thus acquired must be brought frequently to bear on the question who is an employee under the Act. Resolving that question, like determining whether unfair labor practices have been committed, "belongs to the usual administrative routine" of the Board.

*NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 130, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944) (citations and footnote omitted). Thus, the interpretation of section 2(11) calls into play the Board's "special function of applying the general provisions of the Act to the complexities of industrial life." *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963). As the Board's factual findings are conclusive upon review "if supported by substantial evidence on the record considered as a whole," 29 U.S.C. § 160(e) and (f), "the Board's determination that specified persons are 'employees' [or not supervisors] under this Act is to be accepted if it has 'warrant [support] in the record' and a reasonable basis in law." *Hearst*, 322 U.S.

---

**8.** While a ban on solicitation during working hours is valid, rules prohibiting union solicitation outside working hours, although on company property, have been presumed invalid where no evidence was proffered to show the rule reasonable given the circumstances of the work environment. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 & n. 10, 65 S.Ct. 982, 988 & n. 10, 89 L.Ed. 1372 (1945); *see also Hughes Properties, Inc. v. NLRB*, 758 F.2d 1320 (9th Cir. 1985).

at 131, 64 S.Ct. at 861; *see also Lauren Mfg.*, 712 F.2d at 247.

Aquatech points to testimony indicating that Pocius had the authority to tell workers what to do, assist them in procuring materials, give guidance to workers who were making mistakes, and train workers. Although these activities are indicia of responsibility to direct workers, they do not establish that Pocius exercised true independent judgment in the employer's interest. Rather, we find that there is substantial evidence in the record as a whole to support the Board's finding that Pocius did not exercise such judgment and was not a supervisor within the meaning of the statute.

It is undisputed that in assigning work to employees Pocius merely delegated tasks according to the instructions he received from Manes and Manfredonia, his superiors. The assignment of work therefore was routine and did not depend on the exercise of independent discretion indicative of supervisory status. *See NLRB v. First Union Management, Inc.*, 777 F.2d 330, 335 (6th Cir.1985). Although it is true that Pocius' considerable experience allowed him to train and guide workers in the performance of their jobs, "[a]n individual does not become a supervisor merely because he possesses greater skills and job responsibilities than his fellow employees." *Lauren Mfg.*, 712 F.2d at 248.

Moreover, the evidence supports the finding that Pocius did not possess the power to hire, transfer, discharge, reward, promote, discipline workers, or have any other of the authorities enumerated in section 2(11) of the Act. Although Aquatech produced a separation notice with Pocius' signature on it, Pocius' testimony indicates that the decision to fire the employee had been made by Manes, and that Pocius performed the signature task gratuitously. Furthermore, in firing the employee, Pocius' testimony indicates that Manes ignored Pocius' assessment that the employee would learn his duties if given time. In weighing the credibility of the two views presented concerning this incident, the ALJ resolved this question of fact in favor of Pocius' account. As it is the function of the Board and the ALJ to resolve questions of fact and credibility, *Baja's Place*, 733 F.2d at 421, the inferences of the Board and the ALJ, when reasonable in light of the record, will not be displaced even though we might have reached a different conclusion upon a *de novo* review. *Turnbull*, 778 F.2d at 295.

Finally, Aquatech argues that the ALJ erred as a matter of law when she refused to consider whether the leadman position was *perceived* by other employees as a supervisor's position. Aquatech cites *NLRB v. Chicago Metallic Corp.*, 794 F.2d 527, 532 (9th Cir.1986), where the Ninth Circuit states:

> In such borderline cases where satisfaction of the statutory criteria is fairly debatable, the perception of fellow employees weighs more heavily. An employee who technically may not satisfy the statutory criteria of Section 2(11) nevertheless may be accorded supervisory status when he is perceived to be a supervisor by other employees.

Aquatech points to the testimony of leadman Zvonko Besednjak, who responded affirmatively when asked if he "got to supervise other employees," and to the testimony of Cottrell Glaze, who stated that he referred to his leadman as his "little supervisor."

In *Chicago Metallic*, unlike the situation presented here, the employee at issue was assigned no manual chores and had the authority and discretion to take disciplinary action against employees. *Id.* at 531. Even assuming that we were faced with a borderline case analogous to *Chicago Metallic*, the Ninth Circuit simply held that an employee *may* be accorded supervisory status in such a situation. The test for supervisory status also involves an inquiry into "whether the individual 'identif[ies] with the interests of the employer rather than the employees.'" *Lauren Mfg.*, 712 F.2d at 248 (quoting *NLRB v. Wilson–Crissman Cadillac, Inc.*, 659 F.2d 728, 729 (6th Cir.1981)). Evidence that Pocius was not included in any supervisory meetings and that he participated in union activity, for

**550**

which Aquatech does not contest he was fired, is probative of his non-supervisory status and weighs against the ambiguous labels employed by Besednjk and Glaze.[9]

Accordingly, the decision of the Board is AFFIRMED and we order enforcement of its order.

9. Aquatech also contends that the ALJ's bias and partiality led her to deny a fair hearing to the company, in that she did not allow Aquatech to build a record as to employee perception of the leadman position and did not consider whether the position was perceived by employees as supervisory. As Aquatech failed to present this contention to the Board, we are without jurisdiction to consider this issue. *Southern Moldings, Inc. v. NLRB,* 728 F.2d 805, 806 (6th Cir. 1984) (*en banc*); *Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 665–66, 102 S.Ct. 2071, 2082–83, 72 L.Ed.2d 398 (1982).