935 F.2d 270
 137 L.R.R.M. (BNA) 2640
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
C & L SYSTEMS CORPORATION, Respondent.
 No. 90-6216.
 United States Court of Appeals, Sixth Circuit.
 June 18, 1991.
 
 Before NATHANIEL R. JONES and RYAN, Circuit Judges, and BAILEY BROWN, Senior Circuit Judge.
 RYAN, Circuit Judge.
 
 
 1
 Petitioner, the National Labor Relations Board (the "Board"), seeks enforcement of its order and decision finding that respondent, C & L Systems Corp. ("C & L"), violated sections 8(a)(3) and (1) of the National Labor Relations Act, 29 U.S.C. Secs. 158(a)(1) and (3) ("NLRA"). For the reasons set forth below, we shall affirm.
 
 I.
 
 2
 C & L is in the business of unloading new automobiles from railroad cars in Texas, Nebraska, Montana, and Tennessee. In 1986, C & L began unloading automobiles with a nonunionized work force in Memphis, Tennessee, for Burlington and Northern Railroad at the "Yale" facility. In July 1987, Burlington awarded C & L the contract for the "Knight Arnold" facility. Prior to this time, Nu-car Unloading Company had been operating the Knight Arnold facility with an unionized work force from Local No. 984 of the General Drivers, Salesmen and Warehousemen's Union, Affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO (the "Union"). Two months prior to the changeover, C & L President Larry Wofford and Jimmy Strickland, who had been Nu-car's Vice President of Operations and was hired by C & L for the same job, told the Knight Arnold employees that they had to get out of their Union in order for C & L to continue the unloading operation at Knight Arnold.
 
 
 3
 When the changeover occurred, C & L hired the Knight Arnold employees previously employed by Nu-car. C & L did not continue the terms of Nu-car's Union contract. Hourly wages were reduced and employees received fewer hours. Similarly, vacation, holiday, sick leave and overtime pay were reduced and medical benefits were cut.
 
 
 4
 In early 1988, Knight Arnold employees began talking about reacquiring union representation. In particular, Michael Etherton, an unloader, talked with his cousin, Marty Milam, a manager at the Yale facility. Etherton told Milam that C & L was "messing around with employees" and that the employees were going to have to get a union. Milam told Etherton to keep quiet or he would be fired.
 
 
 5
 Thereafter, Knight Arnold employees became more discontented when they perceived Tommy Wilson, a new hire, being given preferential treatment. Generally, employees work when they are called in, and are given an hour to report to work. Wilson was seen as being called in ahead of other employees with greater seniority. On May 8, 1988, several employees went to Strickland and complained about this perceived problem. On May 9, Strickland was told again, by Gary Stevens, a Knight Arnold facility employee for over 10 years, that employees were very upset over the preference being shown Wilson.
 
 
 6
 On or about May 9 or 10, in the employee "break room," several employees discussed Wilson's perceived preferential treatment. Michael Etherton and James Cigalina were present at this meeting. When Etherton left the break room, he found Paul Cannon, the Knight Arnold manager, and Danny Boshers, an office clerk, standing outside the door. As Etherton passed them, he "looked [Cannon] right in the eye" and said, "I guess we are going to have to get a union in here to straighten out the company."
 
 
 7
 After work on May 10, seven Knight Arnold unloaders, Cigalina, Etherton, Wilbur Davis, Jerry Clark, Michael Benbrook, Roy Hibbs, and Walter Gary Stevens, went to the Union and signed membership cards.
 
 
 8
 On May 12, C & L discharged Cigalina, Etherton, and Benbrook. Specifically, Cannon telephoned Cigalina informing him that he was no longer needed because he had been late a few times and had missed a day of work. Cannon also called Benbrook and told him that he was no longer needed, without giving him a reason for his discharge. Cannon also called Etherton and told him to come in to work because Strickland wanted to talk to him. Once Etherton arrived, Cannon escorted him into Strickland's office, whereupon Strickland terminated him because "the insurance had changed." Etherton asked him when the company had changed insurance companies and Strickland answered that he did not know.
 
 
 9
 On May 24, the Union filed an unfair labor practice charge against C & L, alleging that C & L had violated sections 8(a)(1) and (3) of the NLRA by discharging Etherton, Cigalina, and Benbrook because of their union activities. After a hearing in March 1989, the ALJ determined that C & L had violated the NLRA. The Board adopted the ALJ's findings in August 1990.
 
 
 10
 The Board now seeks enforcement of its decision and order. C & L opposes enforcement of that order, claiming that the Board erred in affirming the ALJ's conclusion that it violated the NLRA because the Board's decision is unsupported by substantial evidence in the record. In particular, C & L argues that there is no evidence that it had union animus or that it knew of the employees' union activities. Moreover, C & L argues that it would have discharged Etherton, Cigalina, and Benbrook even in the absence of their protected activities for legitimate, independent reasons.
 
 II.
 
 11
 On review of a Board's order, this court "may not disturb the Board's findings of fact where there is substantial evidence on the record considered as a whole to support the Board's finding." Turnbull Cone Baking Co. v. NLRB, 778 F.2d 292, 295 (6th Cir.1985), cert. denied, 476 U.S. 1159 (1986); 29 U.S.C. Sec. 160(e).
 
 
 12
 " 'Evidence is substantial if it is adequate, in a reasonable mind, to uphold the decision.' " When there is a conflict in the testimony, "it is the Board's function to resolve questions of fact and credibility," and this court ordinarily will not disturb credibility evaluations of the Board or an ALJ, who has observed the witnesses' demeanor. "[T]he Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion had the matter been before it de novo.' "
 
 
 13
 NLRB v. Aquatech, Inc., 926 F.2d 538, 544 (6th Cir.1991) (citations omitted).
 
 III.
 
 14
 It is undisputed that if an employer fires an employee for having engaged in union activities, the employer commits an unfair labor practice, under section 8(a)(3) of the NLRA, if it has no other basis for the discharge. NLRB v. Transportation Management Corp., 462 U.S. 393, 398 (1983). In determining the employer's motive, the Board may rely on all the evidence, including direct admissions and circumstantial evidence. Moreover, " '[c]ircumstantial evidence alone may be sufficient' to prove a section 8(a)(3) transgression." Aquatech, 926 F.2d at 545 (citing Turnbull, 778 F.2d at 297).
 
 
 15
 In this instance, the ruling that the employees' discharges were based upon C & L's union animus turns on credibility determinations which were made by the ALJ and were adopted by the Board. As noted above, we are not free to disturb such evaluations even if we would have made a different choice had the matter been before us de novo. Therefore, although the matter is a close one, we find that the Board's determination that C & L discharged Etherton, Cigalina and Benbrook because of their union activities is substantially supported in the record. Accordingly, we direct that the Board's order and decision be enforced.