NOT RECOMMENDED FOR FULL TEXT PUBLICATION
File Name: 08a0511n.06
Filed: August 20, 2008

Case Nos. 07-2276 / 07-2357

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS | ) | |
| BOARD, | ) | ON PETITION FOR ENFORCEMENT |
| | ) | AND CROSS-APPLICATION FOR |
| Petitioner/Cross-Respondent, | ) | REVIEW OF AN ORDER FROM THE |
| | ) | NATIONAL LABOR RELATIONS |
| v. | ) | BOARD |
| | ) | |
| INTER-DISCIPLINARY | ) | |
| ADVANTAGE, INC. | ) | |
| | ) | |
| Respondent/Cross-Petitioner. | ) | |

BEFORE: COLE and GRIFFIN, Circuit Judges; and SARGUS, District Judge.[*]

**SARGUS, District Judge.** This matter is before the Court on a petition for enforcement of an order of the National Labor Relations Board ("NLRB" or "Board") issued against Inter-Disciplinary Advantage, Inc. ("IDA"), and the cross-appeal of IDA to review and overturn the Board's order. In its order, the Board adopted the recommendations of an administrative law judge, who found that IDA had violated Section 8(a)(1) and (3) of the National Labor Relations Act ("NLRA" or "Act"), and ordered IDA to offer three of its employees full reinstatement and backpay. In its cross-appeal, IDA asserts that the Board erred in concluding that it terminated the employees in violation of the NLRA. Because we find that the NLRB applied the law correctly and the

---

[*]The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

underlying decision of the administrative law judge was supported by substantial evidence, we will grant the NLRB's petition for enforcement and deny IDA's petition for review.

**I.**

In an order dated March 15, 2007, the Board found that IDA had committed the following violations of Section 8(a)(1) the NLRA: (1) maintaining an overly-broad confidentiality rule; (2) creating the impression of employee surveillance of union activity; (3) threatening to discharge employees; (4) coercively interrogating employees; (4) prohibiting union speech; (5) soliciting and implicitly promising to redress grievances; and (6) coercively interrogating an employee regarding discussions with a NLRB agent. Further, the Board concluded that IDA violated Section 8(a)(3) of the NLRA by terminating Marie Abrakian, Linda Foran, and Kelly Lashbrook for engaging in union activities. The Board arrived at these conclusions based on the following facts.

Respondent/Cross-Petitioner, IDA, is a Michigan non-profit corporation. IDA operates licensed, foster-care group homes for adults with mental disabilities throughout the State of Michigan. The Executive Director of IDA is Deborah Pettyplace. Each home operated by IDA is managed by a home supervisor and an assistant home supervisor. Diane Davis is the Program Coordinator who manages each of the group home's supervisors. Davis and Kasie Prevatt work out of the Midland office.[1]

At issue in this case is the Morowske Home, located in Macomb County, Michigan. Diane Haack was the home supervisor at the Morowske Home; Mark Romain was the assistant home manager. The Morowske Home employs ten direct care workers, also called support services

---

[1] The parties dispute whether Prevett was Program Coordinator, and thus, an agent of IDA, or whether, as IDA contends, she was merely a consultant. This issue does not impact the analysis.

specialists, who work in three shifts, twenty-four hours a day, providing around-the-clock care for the residents. When they are hired, each direct care worker signs a confidentiality statement, which provides as follows:

> Any and all information regarding business, employees or Inter-Disciplinary Advantage, Inc., and/or individuals served in IDA homes which is conducted in this office is strictly confidential. Any breach of this confidentiality will result in disciplinary action up to and including immediate dismissal.

(JA 277)(hereinafter "confidentiality rule.")

In March 2005, Marie Abrakian, a direct care worker at the Morowske Home, began discussing the benefits of unionization with her co-workers, Linda Foran and Kelly Lashbrook. Abrakian contacted the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO ("Union") and arranged a meeting between the employees and the union for April 4, 2005 at the union's local hall. Approximately a week before the scheduled date, Abrakian informed her co-workers of the meeting.

In late March, employees began discussing with one another their interest in unionizing. Some of these conversations took place with assistant home supervisor Romain present. Romain informed the employees that if IDA found out about their union sympathies, they could possibly be terminated.

On March 29, 2005, program coordinator Davis gave Haack, the home supervisor, a stack of documents, including a copy of the Morowske Home budget. Some of these documents were labeled confidential. The budget itself, however, was not labeled confidential. Haack placed the confidential documents in her office, but left the budget in an area open to employees and patients. When she arrived at work, Abrakian saw the budget. From her review of it, she was concerned that

-3-

the Home's funds were being misappropriated. Abrakian made a photocopy of the budget, and returned the original to the counter.

The parties dispute the events of April 4, 2005, the day several employees met with the Union representatives.[2] Foran and Lashbrook reported to work for their 6:00 a.m. to 2:00 p.m. shift. They asked Haack for permission to leave early, which she permitted. Lashbrook told Haack she had to go to the bank; Foran did not give a reason. Neither, however, indicated that she was leaving early to attend the union meeting.

On April 4, 2005, one of the residents of Morowske Home, Daniel D., was complaining of an earache. Haack instructed Foran and Lashbrook to try to arrange for a doctor's appointment for him. Lashbrook called the doctor's office. Daniel D. already had an appointment for a physical scheduled on April 7. Lashbrook asked to have the physical appointment moved to April 4, but Daniel's treating physician was not available. Lashbrook did not schedule an appointment for Daniel on April 4, because he would not be able to see his regular doctor, with whom he was comfortable. Haack checked Daniel's vital signs, which were normal, and instructed Foran and Lashbrook to take him to the Friendship House, which provided day programs for Morowske Home special-needs residents.

Foran and Lashbrook took Daniel and three other residents to the Friendship House. They returned to the Morowske Home between 10:30 and 11:00 a.m., and then drove together in Lashbrook's vehicle to the union meeting. Daniel D. had his doctor appointment on April 7, 2005.

---

[2] The following description of the events is derived largely from the ALJ's findings of fact. IDA contends in its cross-petition, however, is that the ALJ improperly credited what it characterizes as the untrustworthy and uncorroborated testimony of Lashbrook, Foran and Abrakian. IDA's version of the facts appears below.

According to IDA, however, Foran and Lashbrook lied about taking Daniel D. to the doctor on April 4, fabricated a story and altered medical records so that it would appear that they had attended the doctor appointment that day, all in an effort to conceal the fact that they were attending the union meeting on company time. IDA also contends that Foran and Lashbrook used the IDA van for personal purposes by taking it to the union meeting.[3]

The ALJ considered and rejected IDA's arguments, finding no credible evidence to support IDA's contention that Lashbrook and Foran inappropriately took the van to the meeting. Lashbrook and Foran denied such use of the van, and specifically testified that they had used Lashbrook's vehicle. Moreover, the ALJ found Randi Schwarks' statement that she "assumed" the plain, unmarked white van in the parking lot belonged to IDA inconsistent with the evidence that Foran and Lashbrook arrived late to the meeting, after Schwark. As to IDA's further contentions regarding an alleged cover up of this purported misconduct, the ALJ recognized all the inconsistencies in the documents, weighed the evidence and made express credibility findings in favor of the employees.

---

[3]     According to IDA, the following evidence supports this conclusion:

- Randi Schwark's statement that she "assumed" Lashbrook and Foran had driven the IDA van to the meeting because she did not see either of their cars in the parking lot at the union hall ;
- An entry on the transportation log on April 4, 2005, which IDA contends is contrived, indicating that Daniel D. was taken to a doctor's appointment that day;
- The Health Care Chronological form, which IDA suggests has been altered, that indicates Daniel D. had been taken for a medical appointment on April 4, 2005;
- A medical consultation form which states that Daniel D. was taken to the doctor's office on April "4," but, according to IDA, the form appears to be tampered with, as if the date originally was a "7."

Eventually, the parties stipulated that Daniel D. did not go to the doctor on April 4, 2005. IDA, however, still asserts that Lashbrook and Foran falsified these documents to cover up their misconduct about taking the van to the union meeting.

The parties agree that Lashbrook, Foran, Abrakian, Tammy Bibbee and Randi Schwark attended the union meeting. Abrakian took with her a copy of the Morowske Home budget, but did not reveal it during the meeting. She later took the budget home with her and disposed of it. At the end of the meeting, everyone but Schwark signed authorization cards.

After the meeting, Romain questioned Abrakian and Lashbrook about their attendance. When questioning Lashbrook, Romain added that he did not think the union was a good idea, that he was "worried," and that Lashbrook should "be careful." Neither Abrakian nor Lashbrook, however, had previously told Romain about the union meeting.

On April 8, 2005, Executive Director Pettyplace met with Davis to discuss complaints about Haack, including a claim that she demonstrated favoritism to some employees and was not present at the Home at certain times during the day. They also discussed Randi Schwark's assertions that Abrakian had a copy of the budget with her at the meeting and her belief that Lashbrook and Foran had taken the IDA van to the union meeting. Pettyplace directed Haack to tell employees that they would be terminated if they participated in union activities during paid work time.

Pettyplace also asked Haack to fax her a copy of the van log, the Health Care Chronological forms, and a consultation referral form that would have accompanied Daniel D. to his doctor's appointment. Pettyplace reviewed these documents and believed that Lashbrook and Foran fabricated the story regarding Daniel D. and his doctor's appointment. Pettyplace and Davis began an investigation regarding the conduct of Abrakian, Lashbrook, and Foran's on the day of the union meeting. Later that same day, the Union faxed and mailed a letter to Pettyplace demanding recognition of the collective-bargaining representative of a unit consisting of Morowske Home's direct care workers.

-6-

Following notice to all staff regarding a mandatory meeting on April 14, 2005, Davis and Prevatt arrived at the Morowske Home in order to conduct employee interviews. Prevatt instructed the employees not to discuss any non-work related matters while waiting for their individual interview. Lashbrook stood and said that the employees "don't have to answer any of their questions about the Union." (JA586, 825.) Prevatt threatened to discharge any employee who engaged in discussions about the union.

During the interviews Prevatt asked employees about the union, including whether employees knew how their supervisors felt about the union, and "who brought up the union talk." Prevatt also asked whether IDA could do anything to improve the workplace or the employees' enjoyment on the job.

Prevatt questioned Lashbrook and Foran about their activities on April 4 and Daniel D.'s medical appointment. Lashbrook explained they had been unable to schedule an appointment with his regular doctor, and instead took him on April 7. Neither Prevatt nor Davis showed any documents to Lashbrook or Foran regarding Daniel's appointment. Neither was afforded an opportunity to view the documents or to explain.[4] Prevatt also questioned Abrakian about the copy she made of the budget, and told her it had violated the Home's confidentiality policy to take it.

On April 25, 2005, IDA terminated Linda Foran, Kelly Lashbrook, and Marie Abrakian for alleged violations of company policy.[5] Specifically, Abrakian's termination letter stated that she

---

[4] IDA contends that, during the interviews, Lashbrook and Foran reported that they had taken Daniel to the doctor on April 4. At the hearing before the ALJ, however, both Lashbrook and Foran explained that they did not understand Prevatt and Davis to be referring to April 4, and believed they were inquiring about Daniel's appointment on April 7. The ALJ credited the employees' testimony.

[5] IDA also terminated Bibbee. The ALJ determined that her termination, after having been discovered sleeping on the job, was justified. The issue of Bibbee's termination is not before the

was being discharged for theft, misappropriation, and misuse of company property. Foran's and Lashbrook's termination letters stated that they were being discharged for providing false information during an investigation, falsifying and altering health records, misappropriating company property for personal use, and conducting personal business on paid time.

On June 22, 2005, the AFL-CIO filed charges alleging that IDA engaged in unfair labor practices in violation of Section 8(a)(1) and (3) of the NLRA. On August 12, 2005, the Regional Director for Region 7 of the NLRB issued a Complaint alleging that IDA had violated the Act.

On October 27, 2005, four days before the hearing, Davis met with Daniel Gwinn, IDA's attorney, and called an employee, Kelly Hibbs, while Hibbs was working. Davis asked Hibbs to meet with Gwinn the next day. Hibbs replied that she would try, but that she would have to find a babysitter. Gwinn then took the phone, and asked Hibbs to meet with him, and indicated he would subpoena her if she did not cooperate. Gwinn asked Hibbs what she had discussed with the Board attorney, and asked Hibbs for a copy of the affidavit she had given the Board. Hibbs faxed a copy of her affidavit to Davis to get Davis "off her back." Hibbs also testified that she submitted the affidavit because she was concerned about angering her employer's attorney.

The case was tried before the administrative law judge in Detroit, Michigan, on several dates between October 31, 2005, and December 15, 2005. On August 8, 2006, the ALJ issued a decision finding that IDA had violated Section 8(a)(1) of the NLRA by enforcing an overly broad confidentiality rule, creating the impression of surveillance, threatening to discharge employees, coercively interrogating employees, prohibiting union speech, soliciting and implicitly promising to redress grievances, and coercively interrogating an employee regarding discussion with a NLRB

Court.

-8-

agent. The ALJ found that IDA violated Section 8(a)(3) of the NLRA by terminating Abrakian, Foran, and Lashbrook for engaging in union activities. Upon review of both parties' exceptions, the Board agreed with the ALJ and affirmed the ALJ's rulings, findings, and conclusions.

**II.**

The Board had subject matter jurisdiction over the proceedings under Section 10(a) of the NLRA, as amended, 29 U.S.C. §§ 151, 160(a), which authorizes the NLRB to prevent unfair labor practices affecting commerce. This Court has jurisdiction under Section 10(e) of the NLRA, 29 U.S.C. § 160(e).

This Court reviews the Board's legal conclusions *de novo*. *Mt. Clemens Gen. Hosp. v. NLRB*, 328 F.3d 837, 844 (6th Cir. 2003). Findings of fact are upheld "if supported by substantial evidence on the record." *Kamtech, Inc. v. NLRB*, 314 F.3d 800, 807 (6th Cir. 2002) (citing NLRA § 10(e) & (f), 29 U.S.C. § 160(e) & (f)). "The 'substantial evidence' standard does not leave factual questions wholly to the NLRB; to the contrary, it requires [courts] to take account of the evidence that undermines the NLRB's conclusions." *Caremore, Inc. v. NLRB*, 129 F.3d 365, 369 (6th Cir.1997). "Substantial evidence" consists of "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Fluor Daniel, Inc. v. NLRB*, 332 F.3d 961, 967 (6th Cir. 2003) (quoting *DuPont Dow Elastomers, L.L.C. v. NLRB*, 296 F.3d 495, 500 (6th Cir. 2002)) (internal citations omitted).

The reviewing court must defer both to reasonable inferences drawn by the NLRB and to its assessment of the credibility of witnesses. *Fluor Daniel*, 332 F.3d at 967; *Kamtech*, 314 F. 3d at 807; *Tony Scott Trucking, Inc. v. NLRB*, 821 F.2d 312, 315 (6th Cir. 1987) ("Deference to the Board's factual findings is particularly appropriate where the 'record is fraught with conflicting

testimony and essential credibility determinations have been made.'") (quoting *NLRB v. Nueva Eng'g, Inc.*, 761 F.2d 961, 965 (4th Cir. 1985)). This Court will not set aside, in favor of its own interpretation, Board findings that are supported by substantial evidence. *Torbitt & Castleman, Inc. v. NLRB*, 123 F.3d 899, 905 (6th Cir. 1997).

## III.

### A.    Section 8(a)(1) Violations

The Board concluded that IDA violated the NLRA by maintaining an overly broad confidentiality rule, creating an impression of surveillance, soliciting grievances, and interrogating an employee as to employee's discussion with a Board agent. Section 7 of the NLRA gives employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Under Section 8(a)(1) of the NLRA, it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" their rights to form, join, or assist labor organizations. 29 U.S.C. § 158(a)(1).

#### 1.    Confidentiality Rule

"The test for determining whether an employer has violated section 8(a)(1) is whether the employer's conduct tends to be coercive or tends to interfere with the employees' exercise of their rights." *V & S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 275 (6th Cir.1999)(citations omitted). As the Supreme Court has explained, "the right of employees to self-organize and bargain collectively established by § 7 of the NLRA, 29 U.S.C. § 157, necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite." *Beth Israel Hosp. v.*

*NLRB*, 437 U.S. 483, 491 (1978). "A rule prohibiting employees from communicating with one another regarding wages, a key objective of organizational activity, undoubtedly tends to interfere with the employees' right to engage in protected concerted activity." *NLRB v. Main Street Terrace Care Ctr.*, 218 F.3d 531, 537 (6th Cir. 2000).

Here, IDA's confidentiality rule provides that "[a]ny and all information regarding business, employees or Inter-Disciplinary Advantage, Inc. . . . which is conducted in this office is strictly confidential. Any breach of this confidentiality will result in disciplinary action up to and including immediate dismissal." (JA 227.) On its face, the confidentiality statement does not explicitly prohibit employees from engaging in protected activity. Nonetheless, the policy classifies "any and all" information as "strictly confidential," the disclosure of which "will" result in discipline or discharge. The rule contains no limitations or exceptions, and wholly prohibits the disclosure of "any and all information." Furthermore, the record contains no evidence that IDA told its employees that certain activities otherwise protected by the NLRA, including, for instance, their right to freely discuss work-place conditions, were exempted under the confidentiality rule. The Court concludes that supports the Board's finding that IDA's employees could reasonably construe the confidentiality rule as prohibiting them from engaging in activities protected under Section 7, such as discussing their wages, benefits, and other terms and conditions of employment.

IDA nonetheless asserts that the confidentiality rule does not violate Section 8(a)(1) because the rule was adopted for the legitimate business purpose of protecting the privacy rights of the Home's residents who have disabilities, and, in any event, the rule was never applied to protected union activity. An employer may have a business justification sufficient to excuse its interference with its employees' protected activity. *Textile Workers Union v. Darlington Mfr. Co.*, 380 U.S. 263,

-11-

269, (1965). Although IDA asserts that its legitimate business purpose was to protect its residents' privacy, the confidentiality rule contains no such limitation and instead sweeps widely to preclude any and all communication, including matters pertaining to the employees themselves. IDA may indeed have a legitimate interest in maintaining the confidentiality of its residents' medical or otherwise private information. The rule itself, however, cannot reasonably be read to prohibit disclosure of only this private information. Instead, the confidentiality rule broadly restricts employees from discussing any information about themselves and the business, and is not confined to matters related to patient privacy. Considering the terms of the confidentiality rule in this case, the Board reasonably concluded that policy would reasonably tend to chill employees in the exercise of their Section 7 rights. *See Brockton Hosp. v. NLRB*, 294 F.3d 100, 106-07 (D.C. Cir. 2002)(holding that hospital policy that stated "[i]nformation concerning patients, associates [that is, nurses], or hospital operations should not be discussed . . . ." was overly broad because it foreclosed discussions among employees about themselves, and was not limited to protection of patient information).

IDA's contention that it did not violate Section 8(a)(1) by maintaining the confidentiality rule because the record contains no evidence that it applied it to protected activity also lacks merit. This Court has consistently held "the actual effect of a statement is not so important as is its tendency to coerce." *NLRB v. Okun Bros. Shoe Store, Inc*., 825 F.2d 102, 107 (6th Cir.1987); *Main St. Terrace Care Ctr*., 218 F.3d at 539. The Court will uphold a finding of a violation if the employees reasonably could have concluded that the employer was coercing them. "'In assessing the lawfulness of the [employer's] rule, we are not concerned with the subjective impact of the rule on particular employees. Instead, we must determine whether the rule reasonably tended to coerce employees in

-12-

the exercise of their Section 7 rights . . . ." *Main St. Terrace Care Ctr.*, 218 F.3d at 539 (quoting

*Waco, Inc.*, 273 N.L.R.B. 746, 748, 1984 WL 37122 (1984)(footnote omitted)). Here, we affirm the

Board's conclusion that IDA's broad confidentiality rule prohibiting employee discussions about any

and all matters related to their employment violates Section 8(a)(1) despite the fact that the rule was

unenforced as to union activities. *See id.* (affirming violation of Section 8(a)(1) despite the fact that

rule was unwritten and routinely unenforced).

Substantial evidence supports the Board's finding that IDA violated Section 8(a)(1) by

maintaining a confidentiality rule that would reasonably tend to chill the employees' exercise of their

Section 7 rights. The Court therefore enforces the Board's finding that IDA's confidentiality rule

violated Section 8(a)(1) of the NLRA.

**2.        Unlawful Surveillance**

The Board also found that IDA unlawfully created the impression that the employees' union

activities were under surveillance when, on April 4, 2005, Romain inquired of Abrakian and

Lashbrook regarding discussions at the union meeting. An employer violates Section 8(a)(1) of the

Act when it either engages in surveillance of protected activity or creates the impression that it is

doing so. *Turnbull Cone Baking Co. of Tennessee v. NLRB,* 778 F.2d 292, 296 (6th Cir. 1985)("[A]n

employer violates the Act . . . by maintaining surveillance of employee union activities.") *N.L.R.B.*

*v. Promedica Health Systems, Inc.,* Nos. 05-1660 & 05-1735, 2006 WL 2860771, *6 (6th Cir. Oct.

6, 2006)(affirming violation of Section 8(a)(1) when employer unlawfully created the impression that

employees' union activities were under surveillance; *NLRB v. Benteler Indus.*, No. 97-5588, 1998

WL 385907,*5 (6th Cir. July 1, 1998) (citing *NLRB v. Aquatech*, 926 F.2d 538, 544 (6th Cir.1991)).

"The Board's test for determining whether an employer has created an impression of surveillance

is 'whether the employee would reasonably assume from the statement in question that his union activities had been placed under surveillance.'" *Promedica Health Sys.,* 2006 WL 2860771 at *6 (quoting *Tres Estrellas de Oro*, 329 N.L.R.B. 50, 51, 1999 WL 701884 (1999)). The Board need not find that the employee subjectively believed that he or she was under surveillance. *Id*.

Ample evidence supports the Board's conclusion that Romain, by inquiring of Abrakian and Lashbrook about the meeting, unlawfully created the impression that IDA was subjecting its employees to surveillance because of their union activities. While Abrakian led the campaign to organize and disseminated information about the April 4 meeting to other employees, no evidence suggests that she did so openly so as to have generally informed IDA management about the status of union activities. Similarly, the record contains no evidence that Lashbrook openly displayed her pro-union opinions before the meeting. Thus, when Romain approached them on April 4, and asked how the union meeting had gone, Abrakian and Lashbrook could reasonably have believed that IDA was keeping surveillance on their union activities. The Board's conclusions in this regard are supported by substantial evidence.

IDA contends that Romain was a minor supervisor, without any authority to discipline or discharge employees, and that he was a peer with respect to the employee-complainants here. As a peer, according to IDA, his passing inquiries regarding union activity do not permit an inference that the employer created an impression of surveillance. IDA relies on *NLRB v. Swan Super Cleaners, Inc*., 384 F.2d 609, 614 (6th Cir. 1967) to support its position that questions from a minor supervisor about a meeting do not prove that the supervisor knew of the employee's union activities.

*Swan Super Cleaners*, properly read, has little application to this case. As it relates to the issue of surveillance, *Swan Super Cleaners* faulted the Board's failure to meet its burden of proof,

-14-

because evidence that the minor supervisor's questions regarding the meeting, standing alone, was too "meager" to prove or permit an inference of a violation of the Act. *Swan Super Cleaners* does not stand for the proposition that a minor supervisor's inquiries may never provide proof that the supervisor knew of the employee's union activities or create an impression that an employer has union activities under surveillance.

Moreover, in this case, IDA cites nothing in the record to substantiate the assertion that Romain was merely a peer, or that even that it took this position before the Board. The record, instead, suggests that the managers and employees at IDA considered Romain to have supervisory authority.[6] In all events, the mere existence of friendly relations between a supervisor and an employee does not preclude a finding that the supervisor violated the Act. *Seligman & Associates, Inc. v. N.L.R.B.*, 639 F.2d 307, 309 (6th Cir.1981).

The Court therefore enforces the Board's order as it relates to its conclusion that IDA unlawfully created the impression of surveillance of employees Lashbrook and Abrakian.

### 3.   Solicitation of Grievances

The Board found that IDA engaged in the unlawful solicitation of employee grievances when Prevatt asked each employee during her interview if there was anything IDA could do to improve the workplace or the employees' enjoyment on the job. As this Court has explained:

> The solicitation of grievances is not itself an unfair labor practice. But when the circumstances of the solicitation implicitly or explicitly promise to correct grievances the solicitation may violate section 8(a)(1). Solicitation of grievances can violate

---

[6]   *E.g.*, JA 685-86 (employees reporting their consternation that Romain mentioned being fired for participating in union activity; and Haack telling Romain that "we need[] to stay out of it and let them do what they needed to do" with respect to joining the union); JA 702 (Pettyplace describing hierarchical structure of the House, noting that the direct care staff reports to the assistant home supervisor, who, in this instance, was Romain).

-15-

Section 8(a)(1) because "the combined program of inquiry and correction" suggests that "union representation [is] unnecessary.". . . . An employer who has not previously solicited grievances but begins to do so in the midst of a union campaign creates "compelling inference" that the employer is "implicitly promising" to correct the problems.

*NLRB v. V & S Schuler Eng'g, Inc.*, 309 F.3d 362, 370-71 (6th Cir. 2002) (finding no past practice of soliciting grievances and thus, solicitation of grievances during union organizing campaign violated the NLRA); *Center Constr. Co., Inc. v. NLRB*, 482 F.3d 425 (6th Cir. 2007) (holding that a deviation from the past practice of soliciting grievances also violates the NLRA, when done during union organizing campaign).

The parties do not dispute that Prevatt questioned employees regarding how IDA could improve the workplace or their enjoyment of the job. The Board found that these questions were an attempt by IDA to elicit from employees grievances with regard to the overall terms and conditions of their employment. While a solicitation of grievances alone is not an unfair labor practice, it nevertheless raises an inference that the employer is promising to remedy the grievances. This inference becomes more compelling when, during a union organizational campaign, an employer that has not previously had a practice of soliciting employee grievances implements one. *V & S Schuler Eng'g,* 309 F.3d at 370; *Center Constr.*, 482 F.3d at 435.[7]

Accordingly, the Court enforces the Board's order finding that Prevatt's conduct on April 14,

_____

[7] IDA contends, for the first time on this appeal, that Prevatt's solicitation was consistent with its "open-door" corporate policy for expressing grievances. As IDA did not raise this contention before the Board, it is barred from raising it now on appeal. 29 U.S.C. § 160(e); *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665-66 (1982)(holding that judicial review of issue not raised before the Board is barred by § 10(e) of the Act, 29 U.S.C. § 160(e), which provides that "[n]o objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.") In any event, Prevatt was not operating under this "open door" policy, and instead sought out and personally solicited employees during individual interviews.

-16-

2005 of soliciting employee grievances, with the implicit promise of remedying them, constituted a violation of Section 8(a)(1) of the Act.

### 4.    Interrogating an Employee as to Discussions with a Board Agent

The Board concluded that IDA violated Section 8(a)(1) when its attorney, Gwinn, questioned Hibbs about statements she may have made to a Board agent in this case, and by asking her for a copy of the affidavit she gave to the Board.   Interrogating employees about statements given to Board agents infringes on NLRA Section 7 rights.  As this Court long ago held in *Montgomery Ward & Co. v. NLRB*, 377 F.2d 452, 455 (6th Cir. 1967):

> Any interrogation by the employer relating to union matters presents an ever present danger of coercing employees in violation of their § 7 rights. On the other hand, fairness to the employer dictates that he be given a reasonable opportunity to prepare his defense. Accommodation of these interests requires that the scope and manner of permissible questioning be strictly confined to the necessities of trial preparation.

IDA contends that Hibbs voluntarily told Gwinn that she would give him the affidavit, and that Gwinn's conversation with Hibbs was necessary to help IDA prepare its defense.  IDA's position, however, is not supported by the record.

The ALJ found, and the Board concurred, that Hibbs was subtly coerced because she complied the day after her superior, Davis, asked her to speak with Gwinn.  Hibbs complied only after Gwinn threatened to subpoena her if she did not cooperate with him, and after Gwinn questioned her about discussions she may have had with a Board agent in this case. These findings of fact are substantiated in the record of this case.

Hibbs' undisputed testimony makes clear that she gave Davis a copy of her affidavit only after Gwinn had asked for it, and after Davis made clear that Gwinn was "bugging her" about obtaining a copy of Hibbs' affidavit.  Moreover, Hibbs admitted that the reasons she finally gave the

affidavit over to Gwinn was that she did not want to anger her employer's attorney.

On this basis, the Court enforces the Board's finding that Gwinn's conduct in questioning Hibbs about discussions she may have had with a Board agent, and in asking Hibbs for a copy of her Board affidavit, was coercive and violated Section 8(a)(1) of the Act.

## B.    Section 8(a)(3) Violations

IDA discharged Abrakian, Linda Foran and Kelly Lashbrook on April 25, 2005. The Board found that IDA discharged these employees for engaging in union activity in violation of Sections 8(a)(3) and (1) of the NLRA. IDA, on the other hand, contends that it terminated these employees due to misconduct that had no relationship to their union activity.

Pursuant to the provisions of 29 U.S.C. § 157:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

The primary purpose of the Act is to "safeguard the right of employees to self-organization and to select representatives of their own choosing for collective bargaining . . . without restraint or coercion by their employer. *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33 (1937); 29 U.S.C. § 151. An employer violates Section 8(a)(3) of the Act when it "discriminate[s] in regard to hiring or firing to discourage membership in any labor organization." *NLRB v. Talsol Corp.*, 155 F.3d 785, 797 (6th Cir. 1998).

An employer generally commits an unfair labor practice under Section 8(a)(3) and (1) by "making an employment decision that discourages union membership or interferes with an

employee's right to organize." *Kamtech,* 314 F.3d at 806. "The threshold test for determining whether the employment decision constitutes an unfair labor practice is whether the decision was motivated by anti-union animus." *Id.* at 806-07 (citing *NLRB v. Cook Family Foods, Ltd.*, 47 F.3d 809, 816 (6th Cir.1995)).

The Board bears the initial burden of establishing, by a preponderance of the evidence, that the employer's decision was motivated by the employees' exercise of their rights protected by the National Labor Relations Act. *Kamtech*, 314 F.3d at 807. If the Board makes such a *prima facie* showing, the burden of persuasion shifts to the employer to prove, again by a preponderance of the evidence, its affirmative defense that the same employment decision would have been made even in the absence of any protected labor activity. *Kamtech*, 314 F.3d at 807 (citing *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir.1995)).

### a. Lashbrook and Foran

IDA primarily contends that Board erred by giving greater weight to the testimony of Foran and Lashbrook than to other contradictory evidence. IDA maintains that Lashbrook and Foran lied and repeatedly changed their stories, and the ALJ should have wholly discredited their testimony. IDA urges the Court to determine that the testimony of Lashbrook and Foran was not credible, and to base its decision instead on the documentary evidence which, according to IDA, establishes that they lied and falsified documents. IDA argues that the documentary evidence justifies its decision to terminate Lashbrook and Foran and demonstrates that the termination of their employment was based on non-union related conduct.

"When a case turns on witness credibility, we will not normally disturb the 'assessment of the Board or an administrative law judge, who has observed the demeanor of the witnesses.'" *Jolliff*

*v. NLRB*, 513 F.3d 600, 607-08 (6th Cir. 2008) (quoting *Litton Microwave Cooking Prods. v. NLRB*, 868 F.2d 854, 857 (6th Cir. 1989)).  Further, when the Board adopts the credibility determinations of the administrative law judge, those determinations are entitled to great weight.  *Taylor Warehouse Corp. v. NLRB*, 98 F.3d 892, 901 (6th Cir. 1996).  The Court will overturn such determinations only if they "'overstep the bounds of reason.'" *Id*. (quoting *Kusan Mfg. Co. v. NLRB*, 749 F.2d 362, 366 (6th Cir. 1984)).

IDA maintains that the ALJ ignored the documentary evidence that refuted Lashbrook and Foran's version of events on the day of the union meeting.  IDA contends that the ALJ should have discredited their testimony as uncorroborated and self-interested.  IDA relies chiefly on *NLRB v. Barberton Plastics Prods., Inc*., 354 F.2d 66 (6th Cir. 1965) as support for its position.

In *Barberton*, this Court held that "the uncorroborated testimony of an untrustworthy and interested witness, who stands to profit from a backpay award, may be held under such facts and circumstances not to constitute substantial evidence on the record considered as a whole." 354 F.2d at 69.  The Court reversed the Board's conclusion that the employer violated the Act where an employee seeking back pay testified that his supervisor warned him that if the plant organized, he would be the first among the employees to be fired.  Upon examining the record as a whole, the Court found that the employee had a history of insubordination, inefficiency, and misconduct, and had provided false information on his employment application.  *Id*. at 68.  As a result, this Court held that the substantial evidence failed to show that the discharge was a violation of the NLRA because the only evidence that supported this conclusion was the employee's uncorroborated, self-serving testimony.  *Id*. at 69.

In *Sam's Club v. NLRB*, 141 F.3d 653, 658 (6th Cir. 1998), however, the Court clarified its

-20-

previous holdings with respect to the credibility of testimony of an interested charging party:

> Taken out of context, this language suggests that the uncorroborated testimony of an interested charging party may never amount to substantial evidence. . . . [H]owever, our case law makes it clear that the uncorroborated and self-serving statements of a party who stands to benefit from an award of back pay may, standing alone, constitute substantial evidence where such testimony is reasonably deemed to be credible and trustworthy, and where it is not undermined by evidence to the contrary.

Faced with diametrically opposed accounts of the activities involving Lashbrook and Foran on April 4, 2005, the ALJ was forced to make credibility determinations on every unfair labor practice allegation. The ALJ found that IDA had based its case against Lashbrook and Foran on "false assumptions, speculation, and conjecture, rather than on any real evidence." The ALJ found that Foran's and Lashbrook's testimony was corroborated; that the testimony from IDA managers was equally self-serving and wholly inconsistent; and that IDA never demonstrated who was responsible for the alleged discrepancies in the documentary evidence, to the extent such documents were ever in fact falsified. The ALJ also throughly reviewed the disputed evidence related to the claim that Lashbrook and Foran used the IDA van for personal purposes. He found that both witnesses had testified credibly that they had taken Lashbrook's vehicle, not the IDA van, to the union meeting; other witnesses disputed Schwark's assumption that the IDA van was in the parking lot; and that IDA's evidence to the contrary was merely speculative.

Because great weight should be given to the ALJ's credibility determinations, the decision to credit the testimony of Foran and Lashbrook will be upheld. Foran and Lashbrook's testimony, together with the testimony of several other witnesses and reasonable inferences drawn from the circumstantial evidence support the Board's findings that anti-union animus motivated IDA's decision to discharge Foran and Lashbrook, and the reasons cited by IDA for terminating these

-21-

employees are pretexts. Accordingly, the Court enforces the Board's finding that Foran and were terminated in violation of Section 8(a)(3) and (1).

### b. Abrakian

IDA maintains that its termination of Abrakian was due to her theft of company property and not due to union activity. It claims that she removed the budget from the Home, which constituted theft and a breach of the confidentiality policy.

In *Wright Line*, 251 NLRB 1083 (1980), *enforced* 662 F.2d 899 (1st Cir. 1981), approved in *NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393, 399-403 (1983), the Board established a causation test for determining whether a discharge or other disciplinary measure taken against an employee violates the Act. Under *Wright Line*, to meet its burden of proof, the Board must make a *prima facie* showing that the action taken against the employee was motivated, at least in part, by his or her involvement in union or other protected activity. A *prima facie* case may be demonstrated by showing that the employee engaged in protected union activity; the employer was aware of such activity; the employer harbored anti-union animus, and such animus was a motivating factor in the adverse decision. If the Board establishes a *prima facie* case, the burden shifts to the employer to demonstrate by a preponderance of the evidence that it would have taken the same action against the employee in the absence of any union or other protected conduct. If, however, the employer's explanation is found to be pretextual– that is, if the cited reasons either did not exist or the employer in fact did not rely on them– the employer will not have satisfied its burden.

IDA advances as its principal argument that Abrakian would have been terminated absent union activity. IDA also objects to the conclusion that its explanation for her termination, namely that she stole company property in the form of the budget, was pretextual. The Court finds, however,

that substantial evidence of record supports the Board's conclusion that anti-union animus motivated IDA's decision to terminate Abrakian's employment.

Abrakian engaged in protected union activity, as she was the primary instigator of the union-organizational campaign. The record also shows that IDA was fully aware of Abrakian's involvement with the union before discharging her. IDA's investigation of Abrakian, Lashbrook and Foran followed just four days after its discovery that the direct care workers at the Morowske Home were seeking to unionize.

The substantial evidence of record supports a finding that IDA failed to demonstrate by a preponderance of credible evidence that it would have discharged Abrakian even if she had not engaged in union activity.[8]

The Board found that IDA failed to provide a clear, consistent and credible explanation for Abrakian's termination. IDA asserted that it discharged Abrakian because she admitted during her April 14 interview that she not only made a copy of the budget, but shared it with others at the union meeting. Abrakian, however, credibly testified that she did not tell Prevatt and Davis during her interview that she showed the document to others. Further, other witnesses at the meeting

---

[8] The ALJ found that IDA had provided "shifting reasons" for Abrakian's termination. It cited the fact that Abrakian's April 25 discharge letter, relied on her alleged theft, misappropriation, and misuse of company property as the sole reasons for her dismissal, with respect to the purported misconduct of removing the budget from the Home without permission and sharing it with others outside the workplace. The ALJ found that IDA asserted at the hearing, for the first time, that Abrakian's conduct in removing a copy of the budget from the home violated its confidentiality rule and the violation of the confidentiality policy was a factor in her termination. The ALJ found that IDA's shifting rationale raised an inference of pretext.

In its order adopting the recommendations of the ALJ, the Board noted IDA's argument that it did not shift the reasons for Abrakian's termination, but instead had cited to the breach of the confidentiality rule merely as incidental to her alleged theft of the budget. We find, as did the Board, that we need not pass on the merits of IDA's contention because other substantial evidence supports the ALJ's finding that IDA's asserted reasons for Abrakian's discharge were pretextual.

-23-

corroborated her testimony. The ALJ, thus, again was called upon to make credibility determinations between the testimony of competing witnesses, and credited the employees' version of events.

The Board reasonably found that IDA produced no evidence other than its own mistaken assertions that Abrakian admitted to disclosing the budget at the union meeting. On this record, the Court finds no basis to disturb the credibility determinations of the ALJ, and uphold the Board's determination that IDA violated the Act by discharging Abrakian.

In sum, we hold that the decision of the Board was supported by substantial evidence and that the Board committed no errors of law. We therefore grant enforcement of the Board's order without modification, and deny IDA's cross-petition for review.[9]

---

[9] By failing to address or take issue with the Board's conclusions with regard to the Section 8(a)(1) violations based on the ALJ's finding that Program Coordinator Prevatt unlawfully interrogated employees about the union, prohibited them from discussing the union, and threatened to discharge employees who engaged in union activities, IDA has effectively abandoned the right to object to those determinations. *NLRB v. Aquatech, Inc.*, 926 F.2d 538, 547 (6th Cir. 1991). We therefore summarily affirm these findings and enforce the related portion of the order.